**WASTE MANAGEMENT HOLDINGS, INC., et al., Plaintiffs,**

**v.**

**James S. GILMORE, III, in his official capacity as Governor of the Commonwealth of Virginia, et al., Defendants.**

**Civil Action No. 3:99CV425.**

United States District Court, E.D. Virginia, Richmond Division.

June 30, 1999.

---

Robert Lawrence Bronston, Kenneth S. Geller, Evan M. Tager, Mayer, Brown & Platt, Washington, DC, for Waste Management Holdings, Inc.

Shawn Alan Copeland, Hunton & Williams, Richmond, VA, John Early Holloway, Hunton & Williams, Norfolk, VA, for Hale Intermodal Marine Co.

Anthony F. Troy, James S. Crockett, Jr., Mays & Valentine, Richmonds, VA, for Weanack Land Limited Partners.

B. Randolph Boyd, Randolph, Boyd, Cherry & Vaughn, Richmond, VA, for Charles City County.

Shawn Alan Copeland, David Alan Rudlin, Timothy George Hayes, Hunton & Williams, Richmond, VA, Meade Addison Spotts, Spotts, Smith, Fain & Rawls, Rich-

mond, VA, Jason S. Thomas, Hunton & Williams, Raleigh, NC, for Brunswick Waste Management.

Deborah Love Feild, Richmond, VA, Ellen Firsching Brown, Attorney General of Virginia, Richmond, VA, Stewart Todd Leeth, Assistant Attorney General, Richmond, VA, William Eugene Thro, Office of the Attorney General, Richmond, VA, for James S. Gilmore, III, John Paul Woodley, Jr., Dennis Treacy, Jr.

Meade Addison Spotts, Hugh McCoy Fain, III, Spotts, Smith, Fain & Rawls, Richmond, VA, for the National Solid Wastes Management Association.

Meade Addison Spotts, Hugh McCoy Fain, III, Spotts, Smith, Fain & Rawls, Richmond, VA, John H. Turner, Houston, TX, for BFI Waste Systems of North America, Inc.

### MEMORANDUM OPINION

SPENCER, District Judge.

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction. For the reasons stated herein, the Court GRANTS the motion in its entirety.

#### I. BACKGROUND

This is an action to enjoin the enforcement of several new Virginia statutes relating to the disposal and transportation of municipal solid waste. The challenged provisions are scheduled to take effect on July 1, 1999.

#### A. *The Parties.*

There are five plaintiffs in this now-consolidated action: (1) Waste Management Holdings, Inc. ("Waste Management"), whose affiliates operate several large landfills in Virginia that accept substantial quantities of out-of-state municipal solid waste; (2) Weanack Land Limited Partners ("Weanack"), which owns a transfer facility on the James River ("the James River Facility") where containerized shipments of municipal solid waste

are offloaded from barges and onto tractor trailers [1]; (3) Hale Intermodal Marine Company ("Hale"), a barging company that transports, among other things, containerized municipal solid waste; (4) Charles City County, which owns property that it leases to Waste Management for use as a landfill ("the Charles City County landfill"); and (5) Brunswick Waste Management Facility, LLC ("Brunswick"), which owns and operates a large landfill in Brunswick County, Virginia. The defendants are James S. Gilmore, III, in his official capacity as Governor of the Commonwealth; John Woodley, in his official capacity as Secretary of Natural Resources; and Dennis Treacy, in his official capacity as Director of the Virginia Department of Environmental Quality (collectively, "the Commonwealth").

#### B. *Municipal Solid Waste Disposal in Virginia.*

According to a November 1998 report on the management of municipal solid waste in Virginia compiled by the Department of Environmental Quality ("DEQ") ("the DEQ Report"), there are presently 70 active landfills that accept municipal solid waste in the Commonwealth. (Waste Management App. 2 at 23.) Although the parties have quibbled somewhat about how many of those landfills accept municipal solid waste from other states, this much is clear: Seven "regional" landfills account for 97% of the out-of-state waste deposited in Virginia. Approximately 61 "local" landfills accept no out-of-state waste at all.

The regional landfills, which are privately operated and have substantially greater disposal capacity than their local counterparts, have been sited and constructed over the last ten years or so to comply with strict state and federal regulations.[2] Each has negotiated "host agreements" with the county in which it is located, whereby it pays the host a fee based on

---

1. Waste Management operates the James River Facility under a contract with Weanack.

2. Many of Virginia's local landfills could not comply with those regulations at the time they were enacted.

the volume of waste (excluding the host's waste) disposed.[3] These agreements also require the regional landfills to perform certain services for their host communities, such as providing free waste disposal and recycling services or paying for the cost of closing the communities' non-compliant local landfills. The construction of these regional landfills has required tens of millions of dollars in private investment, and the landfills face high operation and maintenance costs in addition to the payment of "host fees." To meet their revenue needs and remain economically viable, each relies heavily on the disposal of out-of-state waste. (Wilson Decl. ¶¶ 7–9.) In fact, out-of-state waste accounts for 75% of the municipal solid waste accepted at the five regional landfills operated by Waste Management[4] (DEQ Report at 32) and almost 100% of the waste accepted at Brunswick's regional landfill. (Burrier Aff., Brunswick Exh. 1, ¶ 15.)

Waste Management's agreements with its host counties permit it to dispose of well over 2,000 tons of municipal solid waste per day at all except one of its regional landfills, and, prior to the enactment of the challenged legislation, Waste Management intended to exceed that level in 1999. It further expected that three of its five regional landfills would accept substantially more waste in 1999 than they had in 1998. The Charles City County Landfill, for instance, has been disposing of 2,849 tons of waste per day this year, compared to less than 2,000 tons per day last year. (Wilson Decl. ¶¶ 11, 13–15.) Likewise, Brunswick disposed of approximately 2,400 tons per day in 1998, and in 1999, has accepted more than 2,800 tons per day. Before the enactment of the challenged legislation, it had expected to reach 5,000 tons per day by the end of the year 2000. (Burrier Aff. ¶¶ 10–11.) By

contrast, not one of the sixty-one Virginia landfills that accept only Virginia-generated waste has ever disposed of more than 2,000 tons per day, and only one or two of those might ever be expected to reach that level in the future. (Wilson Decl. ¶ 13.) Indeed, according to a letter from the Virginia Department of Environmental Quality to the chief sponsor of the legislation at issue here, "[m]ost landfills operated by local governments receive less than 100 tons per day; a few receive closer to 500 tons per day." (Waste Management Reply App. 15.)

### C. Waste Management's Contracts to Dispose of Waste Generated in New York City.

For several decades, New York City has disposed of its residential municipal solid waste at the Fresh Kills landfill in Staten Island. In 1997, however, New York Governor George Pataki and New York City Mayor Rudolph Giuliani announced that the Fresh Kills landfill would cease accepting waste in December 2001. The New York City Department of Sanitation ("NYDOS") therefore began to negotiate interim disposal contracts to phase out its dependency on the Fresh Kills landfill. (Cekander Decl., Waste Management Exh. 2, ¶¶ 3–4). Waste Management has been awarded two of those contracts, and much of that waste has been disposed of at its regional landfills in Virginia. In March 1999, it bid on a third contract, which also contemplates the disposal of New York-generated waste in Virginia. (Id. ¶¶ 5, 7–8.)

Most significantly, Waste Management has bid on, and is a primary contender for, a twenty-year contract for the disposal of all or part of 12,000 tons of residential waste per day from Manhattan, Queens,

---

**3.** For instance, Waste Management has paid Charles City County almost $37 million in host fees over the last nine years. (Wilson Decl., Waste Management Exh. 6, ¶ 8.)

**4.** Waste Management operates the following regional landfills: the Charles City County

Landfill; the King George County Landfill and Recycling Facility; the Maplewood Recycling and Waste Disposal Facility, located in Amelia County; the Middle Peninsula Landfill and Recycling Center, located in Gloucester County; and the Atlantic Waste Disposal Landfill in Sussex County. (Wilson Decl. ¶ 5.)

Brooklyn, and the Bronx. NYDOS's request for proposal ("RFP") specifically indicates a desire that the waste removed under this long-term contract be transported by barge and/or rail, rather than by truck. Waste Management's response contemplates sending 60% of the waste specified in the contract to Virginia landfills, particularly the Charles City landfill. It also contemplates that most of the waste will be containerized and transported by barge up the James River for offloading at the James River Facility. (*Id.* ¶¶ 10–11.)

In addition to the residential waste covered by its existing and pending contracts, Waste Management also removes significant quantities of *commercial* waste per day from New York City and surrounding communities. (Magrann Decl., Waste Management Exh. 5, ¶ 3.) Waste Management has been transporting a substantial portion of this waste to Virginia landfills by tractor trailer, but in 1998 began planning to transport much of the waste by barge. In furtherance of this plan, it negotiated a contract with co-plaintiff Hale whereby Hale would lease to Waste Management four barges for five years at a fixed price, with an option to lease an additional two barges. Each barge is capable of carrying 5,000 tons of waste in specially constructed containers that can be stacked five high. Hale and Waste Management expected that barging would commence in March or April 1999, and that, initially, Waste Management would transport 2,500 to 3,000 tons per day from Brooklyn to the James River Facility, where it would be unloaded and delivered to the Charles City County landfill for disposal. (*Id.* ¶¶ 5–6.) Toward this end, Waste Management has agreed to purchase 400 American Bureau of Shipping-approved, double steel walled containers at a cost of $10,000 per container. (*Id.* ¶ 8.) It also has invested more than $5 million in improvements at the James River facility and has guaranteed payment on two cranes for offloading containers that together are worth more than $5 million. (Wilson Decl. ¶ 19.)

Except for the small amount of waste generated on islands like Tangier and transported across the Chesapeake Bay, no in-state waste is transported to Virginia landfills by water.

D. *Political Reaction to the Increased Importation of Out–of–State Waste Into Virginia.*

In June 1998, DEQ issued a report indicating that, during the fourth quarter of 1997 alone, Virginia had imported 788,000 tons of solid waste and that most of it had been disposed of in large commercial facilities. (Waste Management Reply App. 2.) Around the same time, Waste Management's plans to significantly increase its importation of New York City's waste into Virginia began to attract greater notice. In July 1998, State Senator Bill Bolling, chief sponsor of the legislation at issue, wrote to Commonwealth Attorney General Mark Early about the possibility blocking those plans:

> With the impending closure of the Fresh Kills Landfill in New York, I am concerned that the pressure for additional importation will increase even more in the next few years. If it is legally possible to do, I would like to introduce legislation during the 1999 session of the General Assembly that would place restrictions on such importations.
>
> The legislation I am currently considering could take a number of forms. This legislation could seek to prohibit the importation of out-of-state waste altogether. In the alternative, I may seek to limit such importations to those landfills currently receiving out-of-state waste, and to levels reflective of their current importations. However, I do not want to propose such legislation if it would be in violation of federal or state law.

(Waste Management App. 4.) In August 1998, the Congressional Research Service issued a report indicating that Virginia now ranked second only to Pennsylvania as the nation's largest importer of municipal solid waste, taking in 2.8 million tons in 1997. On September 30, 1998, Senator

Bolling announced his intention to introduce legislation aimed at out-of-state waste importation when the General Assembly reconvened in January 1999. In support of his proposals, Senator Bolling highlighted the Commonwealth's newly acquired ranking among waste importing states, Waste Management's recently announced contract to remove 2,400 tons of residential waste per day from New York City, "[m]ost if not all of [which] will be transported on Virginia's waterways," and the impending closure of the Fresh Kills landfill. "New York officials have made no secret of their intent to export the 14,000 tons of garbage a day that are currently disposed of in the Fresh Kills Landfill to other states. It appears as though the vast majority of this garbage may be headed to Virginia as well," Senator Bolling warned. (Waste Management App. 5.)

Governor Gilmore also expressed concern about the increased flow of out-of-state waste into Virginia's landfills. On September 29, 1998, he announced that he was dispatching his top environmental officials to meet with their counterparts from other states "to ensure that Virginia does not drown in a regional sea of garbage." (Waste Management Reply App. 4.) In November, after the DEQ Report was released, the Governor imposed a moratorium on new landfill development and instructed Secretary Woodley to recommend legislation to deal with the problem. (Waste Management Reply App. 5 .)

In his January 13, 1999 State of the Commonwealth address, Governor Gilmore proposed such legislation. Specifically referring to Waste Management's intentions, he noted that "[j]ust two days ago, a major trash company announced plans to import four thousand more tons of New York City trash into Virginia per day." To combat this increase, he announced, he would ask the General Assembly to prohibit the use of barges for transporting municipal solid waste on Virginia's waterways; impose new permit requirements for landfills; cap the amount of waste that may be deposited in Virginia landfills; and increase inspections of waste being hauled by truck or other means. (Waste Management App. 11.) When New York City Mayor Giuliani publicly suggested that Virginia might have an obligation to accept New York City's municipal waste, Governor Gilmore retorted that "the home state of Washington, Jefferson, and Madison has no intention of becoming New York's dumping grounds." (Waste Management Reply App. 10.)

Meanwhile, numerous Virginia lawmakers and other state officials announced their support for Senator Bolling's and the Governor's efforts, frequently couching their positions in anti-out-of-state waste terms. (Waste Management App. 13–18.)

### E. *The Legislation at Issue.*

In March and April 1999, the General Assembly approved and Governor Gilmore signed into law a number of amendments to the Code of Virginia that would impede the importation of out-of-state waste into the Commonwealth. Plaintiffs seek a preliminarily injunction against the following provisions:

### 1. *The Cap Provision.*

First, the General Assembly capped the amount of waste that any landfill may accept at either (1) 2,000 tons per day or (2) the average amount accepted by the landfill in 1998, whichever is greater. 1999 Virginia Acts chs. 580, 611 (adding § 10.1–1408.3) ("the cap provision"). The cap provision also authorizes the Virginia Waste Management Board to grant individual requests for exceptions if, after considering "the potential human health, environmental, transportation infrastructure, and transportation safety impacts and needs," it determines that "(i) [an exception] protects present and future human health and safety and the environment; (ii) there is a need for the additional capacity; (iii) sufficient infrastructure will exist to safely handle the waste flow; (iv) the increase is consistent with the requirements of § 10.1–1408.3 [which establishes the cap]; (v) the public interest will be served by [the increase]; and (vi) the additional capacity is consistent with regional and local

solid waste management plans developed to pursuant to § 10.1–1411." *Id.* (incorporating factors set out in amended version of § 10.1–1408.1(D)). In addition to these factors, the Board must also consider "other factors it deems appropriate to protect the health, safety and welfare of the people of Virginia and Virginia's environmental and natural resources." *Id.* The Board may not approve an exception from the cap "until a public hearing on the proposed increase has been held in the locality where the landfill requesting the increase is located." *Id.*

### 2. *The Barging Restrictions.*

In addition to the cap provision, the General Assembly enacted two new amendments restricting the use of barges for the transport of solid waste on Virginia's waterways (collectively, "the barging restrictions").

### a. *The Stacking Provision.*

Section 10.1–1454.1(A) of the Code of Virginia, enacted in 1998, requires the Virginia Waste Management Board to promulgate regulations governing the transport of municipal solid waste by ship, barge, or other vessel and the loading and unloading of such waste. Va.Code Ann. § 10.1–1454.1(A). Pursuant to the second provision challenged here, those regulations, which have yet to be issued, now must require that containerized waste be stacked no more than two high. 1999 Virginia Acts ch. 608 (amending Va.Code § 10.1–1454.1) ("the stacking provision"). Under the amended version of Subsection B, "[n]o facility shall receive wastes . . . by ship, barge, or other vessel prior to the effective date of the regulations promulgated pursuant to subsection A." *Id.* There is no deadline for the issuance of these regulations.

### b. *The Three–River Ban.*

Finally, the General Assembly added § 10.1–1454.2 to the Virginia Code. This new section prohibits "the commercial transport of hazardous or nonhazardous solid waste by ship barge or other vessel

[upon the] Rappahanock, James and York Rivers, to the fullest extent consistent with limitations posed by Constitution of the United States." 1999 Virginia Acts, chs. 583, 612 (adding § 10.1–1454.2) ("the three-river ban").

### II. THE PRELIMINARY INJUNCTION STANDARD

 A preliminary injunction is a unique remedy, the purpose of which is "to protect the plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." Alan C. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2947 (2d ed.1995). The analysis governing requests for such relief in this circuit is governed by *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977), and its progeny. First, the plaintiff must make a "clear showing" that it will likely suffer irreparable harm in the absence of preliminary injunctive relief. *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 812 (4th Cir.1991). If the plaintiff makes such a showing, then the district court must balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant if injunctive relief is granted. *Id.* (*citing Blackwelder,* 550 F.2d at 195). If the "balance of harms" "tips decidedly in favor of the plaintiff," then a court may grant a preliminary injunction, so long as there are questions going to the merits that are sufficiently serious "as to make them fair ground for litigation and thus more deliberate investigation." *Id.* at 812–13 (*quoting Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991)). If, however, the balance does not tip decidedly in the plaintiff's favor, then a preliminary injunction should issue only if there is a "strong probability" that the plaintiff ultimately will prevail. *Id.* at 813. Finally, the court must consider "whether the public interest favors granting preliminary relief." *Multi–Channel TV Cable v. Charlottesville Quality Cable,* 22 F.3d 546, 551 (4th Cir.1994).[5]

**5.** Relying upon *Virginia Surface Mining and* *Reclamation Association v. Andrus,* 604 F.2d

### III. Discussion

At the outset, the Court acknowledges that the management of municipal solid waste is a highly sensitive and difficult issue with strongly held views on both sides. It is not for the Court, however, to take sides in this debate. As the Fourth Circuit has observed in a similar case, it "can only apply the law." *Environmental Technology Council v. Sierra Club*, 98 F.3d 774, 782 (4th Cir.1996).

### A. Likelihood that Plaintiffs Will Suffer Irreparable Harm if the Court Declines to Grant Preliminary Relief.

■ Before a court may grant preliminary injunctive relief, the plaintiff must make a "clear showing" that he will suffer irreparable harm if the court denies the request. If he fails to make such a showing, then the analysis is at an end. That said, the plaintiff need not make a *precise* showing of the damages that he will suffer in the absence of a preliminary injunction. Indeed, the irreparable injury requirement may be satisfied where damages are "difficult to ascertain," such as a case in which "the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill." *Multi–Channel TV Cable*, 22 F.3d at 551–52. Furthermore, where the only possible remedy ultimately available to the plaintiff is injunctive relief, the requisite showing will be "less strict than in other instances where future monetary remedies are available." *Rum Creek*, 926 F.2d at 362.

■ In this case, the Court is satisfied that failure to enjoin the cap provision and the barging restrictions will irreparably harm Plaintiffs. Not only will they have to immediately curtail their present disposal of waste at certain landfills and divert that waste to other landfills at greater cost, but they may lose potential business opportunities as well. Given that the Eleventh Amendment shields Defendants against claims for money damages, Plaintiffs will never be able recover those losses, even if they ultimately prevail on the merits. Therefore, the Court must proceed to the rest of the *Blackwelder* analysis.

### B. Likelihood of Harm to The Commonwealth if Court Grants Preliminary Injunction.

■ The next step in the *Blackwelder* analysis is to balance the irreparable harm that Plaintiffs will suffer in the absence of a preliminary injunction against the harm that the Commonwealth likely will suffer if the Court *grants* a preliminary injunction. The Court finds that the risk of harm to the Commonwealth is minimal. First, as to the cap provision, it is undisputed that the regional landfills affected by the cap have enormous excess capacity. Indeed, were that not the case, there would have been no need for the Commonwealth to limit their daily intake in the first place. The Commonwealth is therefore unlikely to suffer any appreciable harm should the Court enjoin the enforcement of the cap provision for the short time that it will take to finally resolve this case on the

312 (1979), The Commonwealth has argued that the *Blackwelder* standard does not apply because it was formulated with private litigation in mind, whereas, in this case, Plaintiffs are seeking to enjoin a sovereign State from enforcing its presumably valid laws. *Virginia Surface Mining* is inapposite. There the Fourth Circuit held that the district court should not have applied *Blackwelder* in a challenge against the enforcement of the Surface Mining Control and Reclamation Act of 1977, because Congress had specified the applicable standard for injunctive relief *in the challenged statute itself*. *Id.* at 315. The court did not purport to establish a new standard for *all* cases in which plaintiffs seek to preliminarily enjoin enforcement of public laws. To the contrary, it has consistently applied *Blackwelder* in such cases. *See, e.g.*, *Hazardous Waste Treatment Council v. State of South Carolina*, 945 F.2d 781, 787 (4th Cir. 1991) (applying *Blackwelder* standard in suit to enjoin enforcement of statutes, orders, and regulations dealing with disposal of hazardous waste); *Rum Creek*, 926 F.2d at 360 ("When the current statute is alleged to be unconstitutional, and continued adherence to the statute pending the trial may affect the court's ability to make a meaningful decision, the *Blackwelder* standard properly applies.")

**532**

merits. Likewise, a preliminary injunction against the barging restrictions poses little risk of harm to the Commonwealth. Plaintiffs have presented substantial evidence that container barges are a safe and environmentally friendly mode of transporting waste, and the Commonwealth has presented no evidence to the contrary. Instead, the Commonwealth has argued that the Court should deny the requested relief because Plaintiffs have not affirmatively proved that there will *not* be a barging accident between now and when this case is ultimately resolved. Plaintiffs need not prove a negative, however, in order to obtain the requested relief. They need only show that the harm they are *likely* to suffer in the absence of a preliminary injunction outweighs the harm that the Commonwealth is *likely* to suffer if the Court grants a preliminary injunction. They have satisfied that burden.

### C. *Probability of Success on the Merits.*

As noted above, under *Blackwelder* and its progeny, if the "balance of harms" tips decidedly in the plaintiff's favor, then a court may grant a preliminary injunction, so long as there are serious questions going to the ultimate merits of the case. If, however, the balance does not tip so decidedly, then a preliminary injunction should issue only if there is a "strong probability" that the plaintiff ultimately will prevail. In this case, Plaintiffs have challenged both the cap provision and the barging restrictions on Commerce Clause grounds. They have also challenged the barging restrictions on Supremacy Clause grounds.[6] As explained further below, the Court is of the view that both sets of restrictions are almost certainly invalid under the Commerce Clause. Accordingly, it declines to address the Supremacy Clause argument.

### 1. *General Commerce Clause Principles.*

■ The Commerce Clause of the United States Constitution grants Congress "the Power ... to regulate Commerce ... among the several States." Art. I, § 8, cl. 3. Although the Commerce Clause is phrased as a delegation of power to Congress, it "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden" the free flow of commerce across state lines. *Oregon Waste Systems, Inc. v. Dept. of Environmental Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994). This limitation on state power reflects the framers' firm belief that in order for the new Union to succeed, it "would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Id.* (*quoting Hughes v. Oklahoma,* 441 U.S. 322, 325–26, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979)). With this principle in mind, the Supreme Court has repeatedly held that the Commerce Clause forbids one State from attempting "to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." *City of Philadelphia v. New Jersey,* 437 U.S. 617, 628, 98 S.Ct. 2531, 2538, 57 L.Ed.2d 475 (1978). Furthermore, states may not circumvent this prohibition simply by crafting restrictions which appear, on their face, to be neutral, for the Commerce Clause "forbids discrimination whether forthright or ingenious." *Environmental Technology Council,* 98 F.3d at 787–88 (*quoting West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 214–15, 114 S.Ct. 2205, 2215–16, 129 L.Ed.2d 157 (1994)). Finally, it is beyond question that the free flow of waste across state lines is protected by the Commerce Clause, and that the States have no more power to discriminate against its importation than they do to discriminate against other articles of commerce.[7]

■ Over the years, the Supreme Court has developed a two-tiered analysis for

---

**6.** Brunswick has only challenged the cap provision and, for the purposes of this motion, has limited its argument to the Commerce Clause.

**7.** *See, e.g., City of Philadelphia, supra* (invalidating New Jersey statute prohibiting impor-

tation of most solid or liquid waste originating outside New Jersey); *Chemical Waste Management v. Hunt,* 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992) (striking down

determining whether a particular state law violates the "negative" aspect of the Commerce Clause. First, where a law discriminates against out-of-state interests "facially, in its practical effect, or in its purpose," it will only survive judicial scrutiny if the defendant can show that (1) it "is demonstrably justified by a valid factor unrelated to economic protectionism" and (2) "there are no nondiscriminatory alternatives adequate to preserve the local interests at stake." *Environmental Technology Council*, 98 F.3d at 785 (citing cases). This standard has been characterized as "a virtually per se rule of invalidity," for the Supreme Court has upheld such discriminatory laws only in a few instances where the discrimination was justified by the threat of death or disease. *Id.* (citing *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (upholding Maine's prohibition on importing live baitfish because they threatened destruction of Maine's fisheries); *Clason v. Indiana*, 306 U.S. 439, 59 S.Ct. 609, 83 L.Ed. 858 (1939) (upholding Indiana's restrictions on transporting dead animals without a license)).

■ A more forgiving standard of review applies, however, "[w]here the statute regulates evenhandedly to effectuate a legitimate public interest, and its effects on interstate commerce are only incidental." *City of Philadelphia*, 437 U.S. at 624, 98 S.Ct. at 2535 (*quoting Pike v. Bruce Church*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). Specifically, such legislation "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* This standard reflects the Court's recognition that "incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *Id.* at 623–24, 98 S.Ct. at 2535.

■ As the Fourth Circuit has observed, the line between those laws that are subject to strict scrutiny (and presumptively invalid) and those that are subject to the more relaxed standard of review "is not clear." *Environmental Technology Council*, 98 F.3d at 785. "The crucial inquiry," however, is whether the legislation at issue "is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia*, 437 U.S. at 624, 98 S.Ct. at 2536. The Court has little trouble concluding that the provisions challenged here fall into the former category.[8]

statute imposing an additional fee on all hazardous waste generated outside Alabama and disposed of at Alabama facilities); *Oregon Waste Systems, supra* (striking down $2.50 per ton surcharge on disposal of solid waste generated in other states); *Environmental Technology Council, supra* (invalidating various South Carolina laws intended to limit the amount of out-of-state hazardous waste buried within the State's borders).

8. In its response to Brunswick's memorandum in support of the pending motion, the Commonwealth has taken the position that the provisions at issue here are not, in fact, subject to Commerce Clause scrutiny, because Congress has specifically authorized the states to interfere with the interstate flow of solid waste through Subtitle D of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6941, et seq. Although it is well-established that Congress may affirmatively allow the states to discrimi-

nate against interstate commerce and thereby validate what otherwise would be unconstitutional state action, "[i]n order for a state law to be removed from the reach of the dormant Commerce Clause ... congressional intent to authorize the discriminating law must be either 'unmistakably clear' or 'expressly stated.'" *Environmental Technology Council*, 98 F.3d at 782 (citing cases). In the Court's view, none of the statutory and legislative history excerpts on which the Commonwealth relies express an "unmistakably clear" congressional intent to authorize the legislation at issue here. To the contrary, they merely express a general desire to leave the management of solid waste disposal largely in state and local hands rather than dramatically expand federal regulation over the activity. Indeed, the Commonwealth's characterization of RCRA as an "unmistakably clear" authorization is belied by the fact that Congress has debated interstate waste control legislation on numerous occasions over the last several

#### 2. *The Appropriate Level of Scrutiny.*

The parties agree that the challenged statutes do not discriminate against interstate waste on their face. The Court concludes, however, that they are plainly discriminatory in both their purpose and "practical effect."

#### a. *Virginia's Underlying Purpose.*

The timing of the General Assembly's actions and the statements made by the legislation's chief proponents, including Governor Gilmore, leave no room for doubt that it was enacted with one overriding purpose: to restrict the importation of out-of-state waste, particularly New York waste, into the Commonwealth. In explaining their objectives, the Governor and others repeatedly cited Virginia's newly publicized status as the nation's second leading importer of out-of-state municipal waste and the impending closure of the Fresh Kills landfill in New York. At the same time, they expressed a desire to minimize any restrictions on the disposal of Virginia-generated trash. At a January 5, 1999 hearing before the Senate Solid Waste Subcommittee, for instance, Senator Bolling advised the panel that, based on the concerns he had heard from other Virginia officials, he had revised the cap provision so that, rather than capping *all* landfills at their 1998 levels, it would, as a practical matter, affect only about six large landfills that primarily accept out-of-state waste. (Pltfs' Reply App. 16.) The Commonwealth's revisionist explanations to the contrary notwithstanding, it is impossible to review this record without concluding that the challenged provisions were motivated by an undisguised animus against the importation of out-of-state municipal solid waste.[9]

#### b. *The Practical Effect of the Challenged Provisions.*

Similarly, there is no question but that the practical effect of both the barging restrictions and the cap provision will be to burden the flow of out-of-state waste across Virginia's borders while leaving in-state waste unaffected. Given the Commonwealth's avowed purpose, this is not at all surprising.

#### i. *The Barging Restrictions.*

Though facially neutral, the three-river ban and the stacking provision will exclusively burden out-of-state waste. No Virginia-generated waste is transported on the James, York, or Rappahanock. The small amount of in-state waste that is transported by water is shipped from small islands in the Chesapeake Bay to the mainland. Meanwhile, as the General Assembly knew, Waste Management has transported substantial amounts of municipal solid waste from New York up the James River in the past, and planned to begin doing so again this year. It also intends to utilize the James if it secures the long-term contract with NYDOS.

The stacking provision will have a similarly lopsided effect, because no Virginia-generated waste is transported by container barge. Indeed, it appears that the stacking provision would essentially *preclude* the use of container barges in Virginia, because it would prohibit them from being loaded to more than half-full, which would make them an economically impractical mode of transportation.

The Commonwealth argues that the barging restrictions do not discriminate in practical effect because (1) no waste is being barged right now, and (2) the restrictions burden both in-state and

---

years. Were RCRA's intent as clear as the Commonwealth would have it, there would be no need for such legislation.

**9.** Indeed, lest there be any misunderstanding about the Commonwealth's aim, the Governor's press secretary declared shortly after the hearing on Plaintiffs' motion that the

Court's decision to grant a preliminary injunction would not "keep the governor from vigorously working to protect the environment . . . *and preventing Virginia from becoming the trash import destination for the country.*" Craig Timberg, *Va.Laws on Imports of Trash Blocked,* Washington Post, June 30, 1999, at A1.

out-of-state interests. One of the plaintiffs in this action, the Commonwealth notes, is a Virginia county. The Court is not persuaded. Whether or not any out-of-state waste is presently being barged into Virginia, Waste Management has used barges in the recent past, and, as the Commonwealth knows well, plans to resume barging in the near future. Were that not the case, there would have been no reason for the General Assembly to enact the restrictions in the first place. Nor does the fact that some in-state actors will also be affected by the barging restrictions insulate those restrictions from a Commerce Clause challenge. Any time that a State attempts to limit the importation of an article of commerce, there will be some in-state interests that will suffer. The key inquiry is whether the legislation at issue erects a barrier to the flow of commerce across Virginia's borders while leaving traffic *within* the state unaffected. Such is clearly the case with the barging restrictions. They are therefore subject to strict scrutiny.[10]

### ii. *The Cap Provision.*

■ The Supreme Court has repeatedly stated in the course of striking down other types of restrictions that an evenhanded waste disposal cap might pass constitutional muster, so long as it did not discriminate between in-state and out-of-state waste. See *City of Philadelphia,* 437 U.S. at 626, 98 S.Ct. at 2537; *Chemical Waste Management,* 504 U.S. at 345, 112 S.Ct. at 2015; *Fort Gratiot Sanitary Landfill v. Michigan Dept. of Natural Resources,* 504 U.S. 353, 367, 112 S.Ct. 2019, 2027, 119 L.Ed.2d 139 (1992). Given the practical impact of the Commonwealth's cap provision, however, it cannot be classified as "evenhanded" by any stretch of the

imagination. Of the 61 landfills that presently accept Virginia-generated waste exclusively, not one takes in anywhere close to 2,000 tons per day. It is only the large regional landfills, which accept virtually *all* of the out-of-state waste disposed of in Virginia and rely heavily on out-of-state waste to meet their revenue needs, that will be affected by the cap. Nor is the cap provision rendered any less objectionable by virtue of the fact that the affected landfills may apply for waivers from the Virginia Waste Management Board. As the Supreme Court observed in *Secretary of State v. J.H. Munson Co.,* "[t]he possibility of a waiver may decrease the number of impermissible applications of the statute, but it does nothing to remedy the statute's fundamental defect." 467 U.S. 947, 968, 104 S.Ct. 2839, 2853, 81 L.Ed.2d 786 (1984). The Court therefore finds that the cap provision is not a neutral statute with "only incidental" effects upon interstate commerce, but is, rather, a protectionist measure intended to "saddle those outside the State with most of the burden of slowing the flow of waste" into Virginia's landfills. *Chemical Waste Management,* 504 U.S. at 346, 112 S.Ct. at 2016. It, too, is therefore subject to strict scrutiny.

### 3. *Application.*

As noted above, a finding that a state law discriminates against interstate commerce triggers a virtual per se rule of invalidity. The challenged provisions will only survive if the Commonwealth can prove that they are "demonstrably justified by a valid factor unrelated to economic protectionism" *and* that "there are no nondiscriminatory alternatives adequate to preserve the local interests at stake." *En-*

---

**10.** In its papers and at argument, the Commonwealth has taken the untenable position that the three-river ban cannot possibly be construed as unconstitutional because it contains a "savings clause," which provides that it shall apply "to the fullest extent consistent with the limitations posed by the Constitution of the United States." This is like arguing that a state law prohibiting public universities

from hiring African Americans is immune from challenge under the Equal Protection Clause because it contains language stating that it will only apply insofar as the Constitution permits. The fact is that the Constitution does not permit the challenged legislation at *all.* It therefore may not be "saved" by a "savings clause."

*vironmental Technology Council,* 98 F.3d at 785. It appears highly unlikely that it will be able to satisfy this standard.

 The Commonwealth has cited a variety of reasons for the challenged legislation. First, it points out Virginia's need to preserve landfill capacity and to limit their growth at a reasonable level. The Supreme Court has squarely rejected the notion, however, that "resource protectionism" is a valid defense to a Commerce Clause challenge. *Oregon Waste Systems, supra,* 511 U.S. at 107, 114 S.Ct. at 1354 ("Even assuming that landfill space is a 'natural resource,' 'a State may not accord its own inhabitants a preferred right of access over consumers in other States to natural resources within its borders.'") (*quoting City of Philadelphia,* 437 U.S. at 627, 98 S.Ct. at 2537). The Commonwealth also contends that the laws are justified by Virginia's desire to protect the health and safety of its citizens and the environment. Although these are clearly valid policy concerns, the Supreme Court has made clear that a state may not address those concerns by discriminating against out-of-state waste. *Chemical Waste Management,* 504 U.S. at 345–46, 112 S.Ct. at 2015–16 ("To the extent that Alabama's concern touches environmental conservation and the health and safety of its citizens, such concern does not vary with the point of origin of the waste, and it remains within the State's power to monitor and regulate more closely the transportation of all hazardous waste within its borders.")[11]

Nor is it likely that the Commonwealth will be able to prove that there are no nondiscriminatory means of achieving Virginia's policy objectives. With respect to the cap provision, for instance, Virginia might have imposed a cap that froze all landfills at current disposal levels, rather than one designed to affect only those that accept mostly out-of-state waste.[12] As for the barging restrictions, Virginia clearly could address its health, safety, and environmental concerns without totally prohibiting the use of container barges for transporting solid waste. Indeed, the General Assembly approved such legislation in 1998 in the form of Va.Code § 10.1–1454.1. That section requires that solid waste transported by water be carried in containers "designed, constructed, loaded, operated, and maintained so as to prevent the escape of liquids, waste and odors and to prevent the loss or spillage of waste in the event of an accident." § 10.1–1454.1(F). It further requires the Virginia Waste Management Board to promulgate regulations along those lines. § 10.1–1454.1(A). The General Assembly acted to effectively preclude the use of container barges for transporting interstate waste, however, before the Board ever issued its regulations.

### D. *The Public Interest.*

As another district court observed in a case where the plaintiffs sought to preliminarily enjoin the enforcement of a Mecklenburg County "flow control" ordinance, "determining whether the public interest would be served by the issuance of a preliminary injunction has proven to be quite elusive," for the problems at issue here are "complex, multi-faceted, and involve many uncertainties." *Container Corporation of Carolina v. Mecklenburg County,* 1995 WL 360185 *12 (W.D.N.C.1992) (unpublished). That said, to the extent that the public interest points in either party's favor, the Court finds that it supports the granting of a preliminary injunction in order to protect the free flow of interstate commerce from unconstitutional interfer-

---

**11.** In response to Brunswick's memorandum in support of the motion and at hearing, the Commonwealth suggested that it is justified in distinguishing between New York waste and Virginia waste because New York law permits the disposal of certain items that Virginia law does not. The Commonwealth may, of course, place neutral restrictions on the type of waste that is deposited in its landfills. It may not, however, try to block altogether the importation of another State's waste.

**12.** In fact, as noted above, an early version of Senator Bolling's legislation contained just such a limitation.

ence. Today, it is Virginia that is seeking to stop the flow of New York's garbage across its borders. Tomorrow it may be New York that attempts to block the importation of Virginia's tobacco, another article of commerce that has fallen into public disfavor. Such interstate commercial warfare is clearly in no one's interest.

### IV. CONCLUSION

In conclusion, the Court finds that Plaintiffs have made the necessary showing of irreparable harm and that the "balance of harms" tips in their favor. Furthermore, Plaintiffs almost certainly will succeed on the merits. As in *Environmental Technology Council*, it is clear that the challenged provisions constitute "an integrated and interconnected discriminatory program" whereby Virginia has "attempted to isolate itself from a problem common to [the nation] by erecting a barrier against the movement of interstate trade." 98 F.3d at 786 (internal quotations and citations omitted). This is precisely what the Commerce Clause forbids. Accordingly, the Court will GRANT the motion and ENJOIN Defendants from enforcing the challenged legislation pending the resolution of this matter.