UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 00-1185
(CA-99-425, CA-99-443)

Waste Management Holdings, Inc., et al.,

Plaintiffs - Appellees,

versus

James S. Gilmore, III, etc., et al.,

Defendants - Appellants.

O R D E R

The court amends its opinion filed June 4, 2001, as follows:

On page 4, first full paragraph, line 7, and page 15, footnote 7, line 4 -- the name "John Woodley" is corrected to read "John Paul Woodley."

On page 48, first paragraph, line 3 -- "Id." is corrected to read "id."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WASTE MANAGEMENT HOLDINGS,
INCORPORATED; HALE INTERMODAL
MARINE COMPANY; WEANACK LAND
LIMITED PARTNERS; CHARLES CITY
COUNTY; BRUNSWICK WASTE
MANAGEMENT FACILITY,
Plaintiffs-Appellees,

v.

JAMES S. GILMORE, III, in his official
capacity as Governor of the
Commonwealth of Virginia; JOHN
PAUL WOODLEY, JR., in his official

capacity as Secretary of Natural
Resources; DENNIS TREACY, JR., in
his official capacity as Director of
the Virginia Department of
Environmental Quality,
Defendants-Appellants.

No. 00-1185

GLEN BESA; CAMPAIGN VIRGINIA;
JOHN H. HAGER, Honorable; EMILY
COURIC, Senator; MARGARET
WHIPPLE, Senator; BRUCE JAMERSON;
MARK A. MINER; LILA YOUNG,
Movants.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-99-425, CA-99-443)

Argued: December 7, 2000

Decided: June 4, 2001

Before WIDENER and KING, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

_____

Affirmed in part, vacated in part and remanded by published opinion.
Senior Judge Hamilton wrote the opinion. Judge Widener wrote a
concurring opinion (specifying that he concurs in all parts of the
court's opinion except Part IV.A, but concurs in the result that Part
IV.A obtains). Judge King wrote an opinion concurring in part and
dissenting in part.

_____

## COUNSEL

**ARGUED:** Stewart Todd Leeth, Assistant Attorney General, Rich-
mond, Virginia, for Appellants. Evan Mark Tager, MAYER,
BROWN & PLATT, Washington, D.C.; Timothy George Hayes,
HUNTON & WILLIAMS, Richmond, Virginia, for Appellees. **ON
BRIEF:** Mark L. Earley, Attorney General of Virginia, William H.
Hurd, Solicitor General, Roger L. Chaffe, Senior Assistant Attorney
General, Ellen F. Brown, Assistant Attorney General, William E.
Thro, Assistant Attorney General, Richmond, Virginia, for Appel-
lants. Kenneth S. Geller, Miriam R. Nemetz, MAYER, BROWN &
PLATT, Washington, D.C.; D. Alan Rudlin, Shawn A. Copeland,
HUNTON & WILLIAMS, Richmond, Virginia; Jason S. Thomas,
HUNTON & WILLIAMS, Raleigh, North Carolina; B. Randolph
Boyd, RANDOLPH, BOYD, CHERRY & VAUGHAN, Richmond,
Virginia, for Appellees.

_____

## OPINION

HAMILTON, Senior Circuit Judge:

In March and April 1999, the Commonwealth of Virginia's (Vir-
ginia) General Assembly, its legislative body, enacted and the Gover-
nor of Virginia signed into law five statutory provisions, which,
collectively, cap the amount of municipal solid waste (MSW) that

2

may be accepted by landfills located in Virginia and restrict the use of barges and trucks to transport such waste in Virginia. <u>See</u> Va. Code Ann. §§ 10.1-1408.1(Q); 10.1-1408.3; 10.1-1454.1(A); 10.1-1454.2; 10.1-1454.3 (Michie Supp. 2000). The first statutory provision (the Cap Provision) caps the amount of waste that any landfill located in Virginia may accept.**1** Va. Code Ann. § 10.1-1408.3. The second statutory provision (the Stacking Provision) requires Virginia's Waste Management Board (the Board) to promulgate regulations governing the transport of MSW by ship, barge, or other vessel, as well as the loading and unloading of such waste. Va. Code Ann. § 10.1-1454.1(A). This statutory provision requires that such regulations, which have yet to be issued, prohibit stacking containerized waste on a barge more than two containers high. <u>Id.</u> The third statutory provision (the Three Rivers' Ban), which pertains to barges, prohibits "the commercial transport of hazardous or nonhazardous solid waste . . . by ship, barge or other vessel upon the navigable waters of the Rappahanock, James and York Rivers, to the fullest extent consistent with limitations posed by the Constitution of the United States." Va. Code

_____

**1** Under the Cap Provision, the amount of MSW a landfill located in Virginia may accept is capped at either: (1) 2,000 tons per day or (2) the average amount accepted by the landfill in 1998, whichever is greater. Va. Code Ann. § 10.1-1408.3. The Cap Provision also authorizes Virginia's Waste Management Board to grant individual requests for exceptions if, after considering "the potential human health, environmental, transportation infrastructure, and transportation safety impacts and needs," it determines that "(i) [an exception] protects present and future human health and safety and the environment; (ii) there is a need for the additional capacity; (iii) sufficient infrastructure will exist to safely handle the waste flow; (iv) the increase is consistent with locality-imposed or state-imposed daily disposal limits; (v) the public interest will be served by [the increase]; and (vi) the additional capacity is consistent with regional and local solid waste management plans developed pursuant to § 10.1-1411." <u>Id.</u> (incorporating factors set out in amended version of § 10.1-1409.1(D)). In addition to these factors, Virginia's Waste Management Board must also consider "other factors it deems appropriate to protect the health, safety and welfare of the people of Virginia and Virginia's environmental and natural resources." <u>Id.</u> Virginia's Waste Management Board may not approve an exception from the cap "until a public hearing on the proposed increase has been held in the locality where the landfill requesting the increase is located." <u>Id.</u>

3

Ann. § 10.1-1454.2. The fourth statutory provision (the Trucking Certification Provision) prohibits landfill operators from accepting MSW from a vehicle with four or more axles "unless the transporter of the waste provides certification, in a form prescribed by the Board, that the waste is free of substances not authorized for acceptance at the facility." Va. Code Ann. § 10.1-1408.1(Q). Finally, the fifth statutory provision (the Four or More Axle Provision) requires the Board to develop regulations governing the "commercial transport" of MSW by "any tractor truck semitrailer combination with four or more axles." Va. Code Ann. § 10.1-1454.3(A), (D). Among other things, the Four or More Axle Provision provides that the new regulations require, as a condition of carrying MSW on Virginia roads, the owners of such trucks to make financial assurances that trucks having less than four axles or carrying other cargo need not make. Id. § 10.1-1454.3(A)(2).

Following the enactment of these statutory provisions, several Virginia landfill operators and transporters of MSW and one Virginia county (collectively the Plaintiffs)**2** commenced this 42 U.S.C. § 1983 action in the United States District Court for the Eastern District of Virginia against the following individuals, in their official capacities: (1) Virginia's Governor, James Gilmore; (2) Virginia's Secretary of Natural Resources, John Paul Woodley; and (3) Virginia's Director of the Department of Environmental Control, Dennis Treacy. **3** The Plaintiffs' action challenges the five Virginia statutory provisions on the basis that they are violative of the dormant Commerce, Contract, and

_____

**2** The Plaintiffs are: (1) Waste Management Holdings, Inc. (Waste Management), whose affiliates operate several large landfills in Virginia that accept substantial quantities of MSW generated outside Virginia; (2) Weanack Land Limited Partners (Weanack), which owns a transfer facility on the James River where containerized shipments of MSW are offloaded from barges and onto tractor trailers; (3) Hale Intermodal Marine Company (Hale), a barging company that transports, among other things, containerized MSW; (4) Charles City County, which owns property that it leases to Waste Management for use as a landfill; and (5) Brunswick Waste Management Facility, L.L.C. (Brunswick), which owns and operates a large landfill in Brunswick County, Virginia.

**3** For ease of reference, we refer to these defendants collectively as "the Defendants."

4

Equal Protection Clauses of the United States Constitution.**4** The action seeks declaratory and injunctive relief.

In a published decision dated February 2, 2000, the district court held that the five Virginia statutory provisions at issue were violative of the Constitution's dormant Commerce Clause, and that the Three Rivers' Ban and the Stacking Provision were violative of the Constitution's Supremacy Clause. Waste Management Holdings, Inc. v. Gilmore (Waste Management Holdings III), 87 F. Supp.2d 536, 545 (E.D. Va. 2000). Before this court, on several fronts, the Defendants challenge the propriety of this decision of the district court.**5** For the reasons stated below, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

MSW "generally includes solid waste generated by households, commercial activities, institutions, and non-process waste from industries." (J.A. 249). The Virginia Department of Environmental Quality (DEQ) reported that as of November 1998, there were seventy active landfills in Virginia accepting MSW. Although the parties disagree over how many of those landfills accept MSW from other states, the record is clear that seven "regional" landfills account for ninety-seven percent of the out-of-state waste deposited in Virginia. Approximately sixty-one "local" landfills accept no out-of-state waste at all. DEQ also reported that for the calendar year ending December 31, 1998, New York, Maryland, North Carolina, and Washington, D.C. exported the largest quantities of MSW into Virginia compared to other states or jurisdictions.

_____

**4** Hale challenges two of the Virginia statutes, the Three Rivers' Ban and the Stacking Provision, on the basis that these statutes are violative of the Supremacy Clause of the United States Constitution.

**5** In a published decision dated August 30, 1999, the district court dismissed the Contract Clause claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Waste Management Holdings, Inc. v. Gilmore (Waste Management II), 64 F. Supp.2d 537, 548 (E.D. Va. 1999). On April 11, 2000, the district court sua sponte dismissed the Plaintiffs' claims under the Equal Protection Clause. The propriety of these decisions is not before the court.

5

The regional landfills, which are privately operated and have substantially greater disposal capacity than their local counterparts, have been sited and constructed over the past decade in order to comply with strict state and federal regulations. Pursuant to a "host agreement" with the county in which it is located, each regional landfill pays the host county a fee based upon the volume of waste (excluding the host's waste) deposited at that location. These agreements also require the regional landfills to perform certain services for their host communities, such as providing free waste disposal and recycling services and/or funding the closing of any local landfills which do not meet state and federal regulations. The construction of these regional landfills has required tens of millions of dollars in private investment, and the landfills face high operation and maintenance costs in addition to the sizeable host fees.

To meet their revenue needs and remain economically viable, each regional landfill relies heavily on the disposal of MSW generated outside Virginia. In fact, MSW generated outside Virginia comprises seventy-five percent of the MSW accepted at the five regional landfills operated by Waste Management[6] and almost one-hundred percent of the MSW accepted at Brunswick's regional landfill.

Under its host agreements, Waste Management is permitted to dispose of over 2,000 tons of MSW per day at all but one of its regional landfills. Prior to enactment of the statutory provisions at issue, Waste Management expected to exceed that level in 1999. Waste Management further expected that three of its five regional landfills would accept substantially more waste in 1999 than they had in 1998. The Charles City County Landfill, for instance, accepted approximately 2,849 tons of MSW per day in 1999, compared to less than 2,000 tons per day in 1998. Likewise, Brunswick accepted approximately 2,400 tons per day in 1998, and accepted more than 2,800 tons per day in 1999. Before the enactment of the statutory provisions at issue,

———————————————————————————————

[6] Waste Management operates the following regional landfills: the Charles City County Landfill; the King George County Landfill and Recycling Facility; the Maplewood Recycling and Waste Disposal Facility, located in Amelia County; the Middle Peninsula Landfill and Recycling Center, located in Gloucester County; and the Atlantic Waste Disposal Landfill in Sussex County.

Brunswick had expected to reach 5,000 tons per day by the end of the year 2000. By contrast, not one of the sixty-one landfills located in Virginia that accept only Virginia-generated MSW has ever accepted more than 2,000 tons per day, and only one or two of those might ever be expected to reach that level in the future.

For several decades, New York City has disposed of its residential MSW at the Fresh Kills Landfill in Staten Island. In 1997, New York Governor George Pataki and New York City Mayor Rudolph Giuliani announced that the Fresh Kills Landfill would cease accepting waste in December 2001. The New York City Department of Sanitation, therefore, began to negotiate interim disposal contracts in order to phase out its dependency on the Fresh Kills Landfill. Waste Management has been awarded two of those contracts, and much of the MSW handled under those two contracts has been deposited at its regional landfills in Virginia. In March 1999, it bid on a third contract, which also contemplates the disposal of New York-generated MSW in Virginia. More significantly, Waste Management has bid on, and is a primary contender for, a twenty-year contract to dispose of all or part of 12,000 tons of residential waste per day from Manhattan, Queens, Brooklyn, and the Bronx. New York City's Department of Sanitation's Request For Proposal expresses a preference that any waste removed under this contract be transported by barge and/or rail, rather than by truck.

Waste Management's response contemplates sending sixty percent of the New York City residential MSW to Virginia landfills, particularly the Charles City County Landfill. It also contemplates that most of this waste will be containerized and transported by barge along the James River for off-loading at the James River Facility. In addition to the residential MSW covered by existing and pending contracts, Waste Management also removes significant quantities of commercial waste per day from New York City and surrounding communities. Waste Management had transported a substantial portion of this MSW to its regional landfills in Virginia by tractor trailer, but in 1998 began planning to transport much of the waste by barge. In furtherance of this plan, it negotiated a contract with Hale, whereby Hale would lease to Waste Management four barges for five years at a fixed price, with an option to lease an additional two barges. Each

7

barge is capable of carrying 5,000 tons of MSW in specially constructed containers that can be stacked five high.

Hale and Waste Management expected that barging would commence in March or April 1999, that Waste Management would transport 2,500 to 3,000 tons of MSW per day from Brooklyn to the James River Facility, and that this waste would then be unloaded and delivered to the Charles City County Landfill for disposal. Toward this end, Waste Management has agreed to purchase 400 American Bureau of Shipping-approved, double steel walled containers at a cost of $10,000 per container. It has also invested more than $5,000,000 in improvements at the James River facility and has guaranteed payment on two cranes for off-loading containers that together are worth more than $5,000,000. Only a small amount of MSW generated inside Virginia is transported to Virginia landfills by water.

In June 1998, the DEQ issued a report (the 1998 DEQ Report) indicating that, during the fourth quarter of 1997 alone, Virginia had imported 788,000 tons of MSW. Around the same time, Waste Management's plans to significantly increase its importation of New York City's MSW into Virginia began to attract greater notice. In July 1998, Virginia State Senator Bill Bolling, chief sponsor of the statutory provisions at issue in this appeal, wrote to Virginia Attorney General Mark Earley about the possibility of blocking those plans:

> With the impending closure of the Fresh Kills Landfill in New York, I am concerned that the pressure for additional importation will increase even more in the next few years. If it is legally possible to do so, I would like to introduce legislation during the 1999 session of the General Assembly that would place restrictions on such importations.
>
> The legislation I am currently considering could take a number of forms. This legislation could seek to prohibit the importation of out of state waste altogether. In the alternative, I may seek to limit such importations to those landfills currently receiving out of state waste, and to levels reflective of their current importations. However, I do not want to propose such legislation if it would be in violation of existing federal or state law.

8

(J.A. 576).

In August 1998, the Congressional Research Service issued a report indicating that Virginia now ranked second only to Pennsylvania as the nation's largest importer of MSW, taking in 2,800,000 tons in 1997. Shortly thereafter, on September 30, 1998, Senator Bolling announced his intention to introduce legislation aimed at out-of-state waste importation when the General Assembly reconvened in January 1999. In support of his proposals, Senator Bolling highlighted the Commonwealth's newly acquired ranking among waste-importing states, Waste Management's recently announced contract to remove 2,400 tons of residential MSW per day from New York City, "[m]ost if not all of [which] will be transported by barge on Virginia's waterways," and the impending closure of the Fresh Kills Landfill. (J.A. 601). "New York officials have made no secret of their intent to export the 14,000 tons of garbage a day that are currently disposed of in the Fresh Kills Landfill to other states. It appears as though the vast majority of this garbage may be heading to Virginia as well," Senator Bolling warned. Id.

Governor Gilmore also expressed concern about the increased flow of MSW generated outside Virginia into landfills located in Virginia. On September 29, 1998, he announced that he was dispatching his top environmental officials to meet with their counterparts from other states "to ensure that Virginia does not drown in a regional sea of garbage." (J.A. 597). In November 1998, Governor Gilmore imposed a moratorium on new landfill development and instructed Secretary Woodley to recommend legislation to deal with the problem. Furthermore, in his January 13, 1999 State of the Commonwealth address, Governor Gilmore proposed such legislation. Specifically referring to Waste Management's intentions, he noted that "[j]ust two days ago, a major company announced plans to import four thousand more tons of New York City trash into Virginia per day." (J.A. 630). To combat this increase, he announced that he would ask Virginia's General Assembly to take the following steps: (1) to prohibit the use of barges for transporting MSW on Virginia's waterways; (2) to impose new permit requirements for landfills located in Virginia; (3) to cap the amount of waste that may be deposited in Virginia landfills; and (4) to increase inspections of waste being hauled by truck or other means. And when New York City Mayor Giuliani suggested that Virginia

9

might have an obligation to accept New York City's MSW, Governor Gilmore responded that "the home state of Washington, Jefferson, and Madison has no intention o[f] becoming New York's dumping grounds." (J.A. 635). Meanwhile, numerous Virginia lawmakers and other state officials announced their support for Senator Bolling and the Governor's efforts, frequently couching their positions in anti-out-of-state MSW terms.

In March and April 1999, Virginia's General Assembly approved and Governor Gilmore signed into law the five statutory provisions at issue in this case. The present civil action followed. On June 30, 1999, in a published decision, the district court granted the Plaintiffs' motion for a preliminary injunction against the Defendants' enforcement of the Cap Provision, the Stacking Provision, and the Three Rivers' Ban, pending resolution of the Plaintiffs' claims. Waste Management Holdings, Inc. v. Gilmore (Waste Management I), 64 F. Supp.2d 523 (E.D. Va. 1999). In granting the motion, the district court held the Plaintiffs had made the necessary showing of irreparable harm and the balance of harms tipped in their favor. Id. at 537. The district court further held that the Plaintiffs would almost certainly succeed on the merits. Id. According to the district court, "the challenged provisions constitute `an integrated and interconnected discriminatory program' whereby Virginia has `attempted to isolate itself from a problem common to [the nation] by erecting a barrier against the movement of interstate trade.'" Id. (quoting Environmental Tech. Council v. Sierra Club, 98 F.3d 774, 786 (4th Cir. 1996)) (alteration in original). "This," the district court held, "is precisely what the Commerce Clause forbids." Waste Management I, 64 F. Supp.2d at 537. The Defendants filed a notice of appeal and a motion in our court for a stay of the preliminary injunction pending appeal. We denied the motion, and the Defendants withdrew their appeal.

On August 24, 1999, the district court granted the Plaintiffs' motion to strike the Defendants' asserted affirmative defense that because New York City had allegedly taken affirmative steps to discourage the disposal of New York City generated MSW within the borders of the State of New York, the Plaintiffs' constitutional challenges were barred insofar as they arose from their interest in importing solid waste from New York City. The Defendants next filed a motion to dismiss for failure to state a claim upon which relief may

10

be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The Defendants sought dismissal of the entirety of the Plaintiffs' complaint on two bases: (1) that the Plaintiffs lacked standing to challenge the disputed laws because Virginia's counties lacked authority (i.e., ultra vires) to enter into the landfill host agreements; and (2) that the Plaintiffs' action is barred by the doctrine of sovereign immunity as provided in the Eleventh Amendment. In addition, the Defendants contended that each of the Plaintiffs' claims should be dismissed for failure to state a claim on the merits. Finally, the Defendants contended that Charles City County must be dismissed as a plaintiff because it lacked standing to sue its creator.

On August 30, 1999, in a published decision, the district court dismissed the Contract Clause claims for failure to state a claim, but denied the remainder of the Defendants' Rule 12(b)(6) motion. Waste Management Holdings, Inc. v. Gilmore (Waste Management II), 64 F. Supp.2d 537, 548 (E.D. Va. 1999). The district court declined to address the issue of whether Charles City County should be dismissed as a plaintiff based on its (the district court's) belief that each of the other plaintiffs had standing to raise the claims alleged. Id. at 548.

Following the close of discovery, the Plaintiffs filed a motion for summary judgment with respect to their dormant Commerce Clause and Supremacy Clause claims. The Defendants filed a cross-motion for partial summary judgment with respect to the constitutionality of the Cap Provision. On February 2, 2000, again in a published decision, the district court granted the Plaintiffs' motion for summary judgment "in its entirety" and denied the Defendants' motion for partial summary judgment. Waste Management Holdings III, 87 F. Supp.2d 536, 545 (E.D. Va. 2000). Notably, the district court's memorandum opinion did not separately address the constitutionality of the Trucking Certification or the Four or More Axle Provision under the dormant Commerce Clause or the Three Rivers' Ban or the Stacking Provision under the Supremacy Clause. For reasons not relevant to the present appeal, the district court later sua sponte dismissed the Plaintiffs' claims under the Equal Protection Clause. The Defendants noted a timely appeal.

II.

Under Federal Rule of Civil Procedure 56, a court should grant a motion for summary judgment "if the pleadings, depositions, answers

11

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court should review all of the evidence in the record. Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2110 (2000). "In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Id.

> Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the non-movant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."

Id. (quoting 9A Charles Allan Wright & Arthur R. Miller, Federal Practice and Procedure § 2529, p. 299 (2d ed. 1995)). We review de novo a district court's decision to grant a motion for summary judgment. Myers v. Finkle, 950 F.2d 165, 167 (4th Cir. 1991).

III.

The Defendants first argue the doctrine of sovereign immunity, as reflected in the Eleventh Amendment, bars the Plaintiffs' entire action. We disagree.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI. The Supreme Court has recognized that the doctrine of sovereign immunity under the Eleventh Amendment extends beyond the literal text of the Eleventh Amendment to prevent a state from being sued by one of its own citizens without its consent. Alden v. Maine, 527 U.S. 706, 727-28 (1999). Accordingly, the present suit by the Plaintiffs' is barred by the Eleventh Amendment unless

12

it falls within the exception recognized in <u>Ex Parte Young</u>, 209 U.S. 123 (1908), which permits certain suits in federal court against state officers.

Under the <u>Ex parte Young</u> exception, a suit in federal court to enjoin a state officer from enforcing an unconstitutional statute is not a suit against the state for purposes of the Eleventh Amendment. <u>Id.</u> at 159-60.

> The theory of <u>Ex parte Young</u> is that because an unconstitutional statute is void, it cannot cloak an official in the state's sovereign immunity. Although the reasoning of <u>Ex parte Young</u> has never been extended to claims for retrospective relief, federal courts may grant prospective injunctive relief against state officials to prevent ongoing violations of federal law.

<u>CSX Transp. Inc. v. Board of Public Works</u>, 138 F.3d 537, 540 (4th Cir. 1998). The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent. <u>Summit Medical Assocs., P.C. v. Pryor</u>, 180 F.3d 1326, 1338-1341 (11th Cir. 1999), <u>cert. denied</u>, 529 U.S. 1012 (2000).

Over three years ago, the Supreme Court held that the <u>Ex parte Young</u> doctrine cannot be used to allow a federal court to hear what is the functional equivalent of a quiet-title action against a state. <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261 (1997). In the 1997 decision so holding, two of the Justices (Chief Justice Rehnquist and Justice Kennedy) called for a fundamental reconceptualization of <u>Ex parte Young</u>. If given the chance, they would limit the <u>Ex parte Young</u> "exception" to cases in which no state forum was available to decide whether federal law entitled the plaintiff to injunctive relief. <u>Coeur d'Alene</u>, 521 U.S. at 270-280 (Kennedy, J., joined by Rehnquist, C.J.). But this limitation of <u>Ex parte Young</u> was decisively rejected by the other seven Justices. <u>See</u> 521 U.S. at 287-295 (O'Connor, J., joined by Scalia and Thomas, JJ., concurring); 521 U.S. at 297 (Souter, J., joined by Stevens, Ginsburg, and Breyer, JJ., dissenting).

The Defendants acknowledge that Justice Kennedy and Justice Rehnquist's limiting view of the <u>Ex parte Young</u> doctrine in <u>Coeur</u>

13

<u>d'Alene</u> "has not yet been adopted by the full Court," (the Defendants' Br. at 20). The Defendants nonetheless argue that we should apply it in the case before us to conclude that <u>Ex parte Young</u> does not prevent the Eleventh Amendment from barring the Plaintiffs' suit.

The fallacy of the Defendants' argument is obvious. Application of the <u>Ex parte Young</u> doctrine has not been limited to cases where no state forum is available to decide whether federal law entitles a plaintiff to injunctive relief. The case before us is precisely the type of case to which the <u>Ex parte Young</u> doctrine applies. <u>See, e.g.</u>, <u>CSX Transp. Inc. v. Board of Public Works</u>, 138 F.3d 537, 541 (4th Cir. 1998) ("An injunction against the future collection of the illegal taxes, even those that already have been assessed, is prospective, and therefore available under the <u>Ex parte Young</u> doctrine."). Indeed, if a precedent of the Supreme Court has direct application in a case, yet appears to rest on reasons expressly rejected by a few or even a majority of the Justices in some other line of decisions, "the Court of Appeals should follow the case which directly controls, leaving to[the Supreme] Court the prerogative of overruling its own decisions." <u>Rodriguez de Quijas v. Shearson/American Express, Inc.</u>, 490 U.S. 477, 484 (1989).

Next, the Defendants contend that even if the Eleventh Amendment does not bar the Plaintiffs' action altogether, Governor Gilmore should be dismissed as a party because he does not have direct enforcement responsibility with respect to the statutory provisions at issue. Below, both the Plaintiffs and the district court recognized that Governor Gilmore lacks direct enforcement authority with respect to the statutory provisions at issue. However, the Plaintiffs contended and the district court agreed that Governor Gilmore was a proper defendant because he actively and publicly defended the statutory provisions at issue. <u>Waste Management II</u>, 64 F. Supp.2d at 543 n.6. On appeal, the Plaintiffs argue in favor of keeping Governor Gilmore in the suit on the same basis.

We agree with the Defendants that Governor Gilmore should be dismissed as a party. <u>Ex parte Young</u> requires a "special relation" between the state officer sued and the challenged statute to avoid the Eleventh Amendment's bar. <u>Ex parte Young</u>, 209 U.S. at 157. "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the

14

law." Children's Healthcare is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1416 (6th Cir. 1996) (internal quotation marks omitted). Thus, "[t]he mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute." Shell Oil Co. v. Noel, 608 F.2d 208, 211 (1st Cir. 1979).

Here, although Governor Gilmore is under a general duty to enforce the laws of Virginia by virtue of his position as the top official of the state's executive branch, he lacks a specific duty to enforce the challenged statutes. Thus, we vacate the judgment against him and remand with instructions that the district court dismiss him as a defendant in this action. The fact that he has publicly endorsed and defended the challenged statutes does not alter our analysis. The purpose of allowing suit against state officials to enjoin their enforcement of an unconstitutional statute is not aided by enjoining the actions of a state official not directly involved in enforcing the subject statute.[7]

IV.

The Defendants next dispute the district court's conclusion that the Plaintiffs possess standing to challenge the statutory provisions at issue.

A.

According to the Defendants, Virginia counties have no authority to operate or contract for the operation of a landfill for-profit that accepts MSW generated outside Virginia. Accordingly, they contend, the host agreements and the counties' actions with regard to acceptance of MSW generated outside Virginia are ultra vires. Since the host agreements form the basis for this litigation, the Defendants reason the Plaintiffs lack standing.

_____

[7] Given our holding that Governor Gilmore should be dismissed from this action, from this point forward, when our opinion refers to "the Defendants," we are referring to the two remaining defendants/appellants, John Paul Woodley and Dennis Treacy. We note that Governor Gilmore joined them in all arguments they have presented on appeal.

15

As the Defendants correctly assert, Virginia law follows "Dillon's Rule," which holds that a municipal corporation possesses only those powers that are: (1) expressly granted by Virginia, (2) necessarily or fairly implied in or incidental to the powers expressly granted, or (3) "essential to the declared objects and purposes of the corporation, not simply convenient but indispensable." Richmond v. Board of Supervisors of Henrico County, 101 S.E.2d 641, 645 (Va. 1958) (internal quotation marks omitted). "Any fair, reasonable doubt concerning the existence of the power is resolved by the courts against the corporation and the power is denied." Id.

Here, Virginia Code § 15.2-932 grants "[a]ny locality" authority "to contract with any person, whether profit or nonprofit, for garbage and refuse pickup and disposal service in its locality and to enter into contracts relating to waste disposal facilities which recover energy or materials from garbage, trash and refuse." Va. Code Ann. § 15.2-932 (Michie 1997) (emphasis added). The Defendants argue that applying Dillon's Rule to this statute results in the interpretation that Virginia counties lack the power to contract for waste disposal that is not their own waste.

We hold the district court properly rejected the Defendants' ultra vires argument. A plain reading of the language of Virginia Code § 15.2-932, even in light of Dillon's Rule, grants every Virginia county the authority to enter into the host agreements at issue. In this regard, we rely upon the following language: "[a]ny locality" has the authority "to contract with any person, whether profit or nonprofit, for garbage and refuse pickup and disposal services in its locality . . . ." Id. (emphasis added). Critically, this language does not limit the term disposal to disposal of intra locality garbage or refuse pickup as the Defendants suggest.

B.

According to the Defendants, Waste Management and Brunswick lack standing to challenge the Cap Provision, because they did not first apply for an increase in their tonnage allotment under the variance provision. The Defendants further argue that "it has even been conceded that, if the regional landfills had applied for increased ton-

16

nage allotments, DEQ staff probably would have granted those requests." (the Defendants' Br. at 29).

In support of this last argument, the Defendants cite the deposition testimony of Lee Wilson. Lee Wilson is employed as a district manager by USA Waste of Virginia, Inc., which is a subsidiary of Waste Management. In his district manager position, Lee Wilson is responsible for the operations of three landfills located in Virginia and a number of transfer stations. Among other things, his duties include developing and submitting bids to perform waste handling services for customers, providing services to Waste Management's customers, negotiating contracts with vendors, developing and implementing business plans, and dealing with federal, state, and local regulatory agencies and officials.

In deposition, Lee Wilson was asked to give his opinion "after working here in the State of Virginia and knowing the regulators and knowing your landfills, do you think they would grant you an extension?" Lee Wilson answered "[f]rom a regulatory standpoint, yes, from a political standpoint, no." (J.A. 1371).

The Defendants' argument that Waste Management and Brunswick lack standing to press their constitutional claims because they have not already applied for an increase in their tonnage allotment is without merit. If the cap is allowed to take effect, the maximum daily tonnage that Waste Management and Brunswick may receive at their landfills will be dramatically reduced. The Cap Provision would prevent Waste Management and Brunswick from bidding on contracts while variance applications are pending. The prospect of such harm confers standing. See Bob's Home Service, Inc. v. Warren County, 755 F.2d 625, 627 (8th Cir. 1985) (cap prohibiting expansion of a waste disposal facility until granted a permit by the state presented justiciable controversy because cap denied plaintiffs the right to expand their operations in the future and implied an immediate injury, i.e., a reduction in the value of plaintiffs' land and business). As for the alleged concession by Waste Management that it would receive a waiver in its tonnage allotment, a fair reading of Lee Wilson's testimony reveals that he did not make such a concession. At most, Lee Wilson identified competing forces with opposing views on the matter. In short, the Defendants' contention that Waste Management and

17

Brunswick lack standing to press their constitutional challenge to the Cap Provision is without merit.

C.

Lastly with respect to standing, the Defendants argue the Plaintiffs lack standing to challenge the Stacking Provision, the Three Rivers' Ban, and the Four or More Axle Provision because respective saving clauses provide that these provisions will be implemented only to the extent allowed by federal law. Virginia Code Ann. § 10.1-1454.1 (barge regulations shall include stacking limits only "to the extent allowable under federal law"); § 10.1-1454.2 (Three Rivers' Ban will be enforced only to the "extent consistent with limitations imposed by the Constitution of the United States"); § 10.1-1454.3 (regulations under Four or More Axle Provision to be enforced only "to the extent allowable under federal law"). We disagree.

The saving clauses upon which the Defendants rely do not prevent the Plaintiffs from challenging the Stacking Provision, the Three Rivers' Ban, or the Four or More Axle Provision, because the language of those clauses is repugnant to the straightforward, limiting language of the respective statutory provisions. <u>Looney v. Commonwealth</u>, 133 S.E. 753, 755 (Va. 1926) ("It is well settled that saving clauses which are inconsistent with the body of an act are rejected and disregarded as ineffective and void."); <u>see also Sutherland on Statutory Construction</u>, § 47:12 (same).

V.

We now turn to address the merits of the Plaintiffs' dormant Commerce Clause challenge to the statutory provisions at issue. The Commerce Clause provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce . . . among the several States . . . ." Art. I, § 8, cl.3. Supreme Court precedent has long recognized that although phrased as a grant of regulatory power to Congress, the Commerce Clause inherently "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." <u>Oregon Waste Sys. v. Department of Envtl. Quality</u>, 511 U.S. 93, 98 (1994).

18

We apply the following two-tier approach in determining the constitutionality of a statutory provision challenged under the dormant Commerce Clause:

> The first tier, a virtually _per se_ rule of invalidity, applies where a state law discriminates facially, in its practical effect, or in its purpose. In order for a law to survive such scrutiny, the state must prove that the discriminatory law is demonstrably justified by a valid factor unrelated to economic protectionism, and that there are no nondiscriminatory alternatives adequate to preserve the local interests at stake. . . .

> The second tier applies if a statute regulates evenhandedly and only indirectly affects interstate commerce. In that case, the law is valid unless the burdens on commerce are clearly excessive in relation to the putative local benefits.

Envtl. Tech. Council v. Sierra Club, 98 F.3d 774, 785 (4th Cir. 1996) (internal quotation marks and citations omitted); see also Eastern Kentucky Resources v. Fiscal Court of Magoffin County, 127 F.3d 532, 540 (6th Cir. 1997) ("A statute can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect.").

A.

Here, the parties are in agreement that the statutory provisions at issue are not facially discriminatory against MSW generated outside Virginia. Thus, we must determine whether the statutory provisions at issue would discriminate against MSW generated outside Virginia in their practical effect or were enacted for the purpose of discriminating against MSW generated outside Virginia. Quite obviously, both inquiries present questions of fact. If the answer to either question is yes, we apply strict scrutiny analysis.

B.

1.

The Plaintiffs offer the following evidence in support of their contention that the Cap Provision would discriminate against MSW gen-

19

erated outside Virginia in its practical effect. First, the Plaintiffs rely upon a November 1998 report issued by DEQ, reporting that, with respect to the MSW received by the seven large regional landfills in Virginia, approximately ninety-seven percent is MSW generated outside Virginia, while only two of the sixty-three small local landfills in Virginia accepted the remaining approximately three percent. Second, the Plaintiffs rely upon a sworn statement by Lee Wilson that he has personal knowledge that all seven of the large regional landfills in Virginia, except for the Gloucester County landfill, which operates under a local cap of 2,000 tons per day, have disposed of more than 2,000 tons per day of MSW in the past or can reasonably be expected to do so in the future. By contrast, he further stated, none of the approximately sixty-three landfills that receive principally Virginia-generated MSW receive any amount of MSW close to 2,000 tons per day of MSW. The Plaintiffs argue that from this evidence, a reasonable juror could only find that if the Cap Provision is allowed to take effect, it will impose a real and substantial burden on MSW generated outside Virginia while barely, if at all, impacting MSW generated in Virginia. Specifically, the burden is less access to permanent disposal.

In response, the Defendants argue that the Plaintiffs' evidence is legally insufficient because Lee Wilson did not identify a basis for his testimony and provided no reason to believe that he had personal knowledge of this information. Furthermore, the Defendants argue that Lee Wilson's testimony is contradicted by their evidence that the Southeastern Public Authority Landfill (SPA Landfill), which accepts exclusively Virginia MSW, operates near the cap already and expects to reach that level soon. Moreover, the Defendants argue, the effect of the Cap Provision on the SPA Landfill is demonstrated by the fact that prior to the injunction against enforcement of the Cap Provision, the SPA Landfill applied for an increased tonnage allotment under the Cap Provision.

The Plaintiffs argue in response that Lee Wilson had ample basis for his testimony based upon his knowledge and experience in the MSW industry and based upon DEQ's November 1998 report. With regard to the SPA Landfill, the Plaintiffs note that on December 30, 1998, DEQ reported to Senator Bolling that the SPA Landfill receives 1,540 tons of MSW per day and that when the SPA Landfill applied for an increase in tonnage allotment, it made clear that it expected to

20

exceed the cap only on the "rare" occasions when its waste-to-energy plant is shutdown for repairs. (J.A. 1002).

After reviewing the evidence and arguments offered by both sides on this issue, we conclude that a genuine issue of material fact exists regarding whether the Cap Provision discriminates in its practical effect against MSW generated outside Virginia. Thus, the Plaintiffs are not entitled to summary judgment in their favor with respect to this issue.

2.

With respect to the Stacking Provision and the Three Rivers' Ban, the Defendants do not dispute that a far greater amount of MSW generated outside Virginia, as compared to MSW generated inside Virginia, is shipped in specialized containers on barges on Virginia's waterways for ultimate disposal in landfills located in Virginia. Likewise, the Defendants do not dispute that Hale and Waste Management had serious proposals, prior to the enactment of the statutory provisions at issue, whereby Hale would lease four barges for five years to Waste Management, which Waste Management in turn would use in transporting MSW generated in New York to Virginia on Virginia waterways for disposal in landfills located in Virginia. Finally, the Defendants do not dispute that enforcement of the Stacking Provision would more than double the cost of shipping MSW by barge on Virginia waterways.

Nevertheless, the Defendants argue that the Plaintiffs' evidence is insufficient to establish that the Stacking Provision and the Three Rivers' Ban discriminates in practical effect against MSW generated outside Virginia because the Plaintiffs failed to present any evidence establishing that there is not, never has been, and never would be any interest in barging MSW generated inside Virginia. The Defendants offer no citation of authority for this argument and we understand why. The obvious focus of the practical effect inquiry is upon the discernable practical effect that a challenged statutory provision has or would have upon interstate commerce as opposed to intrastate commerce. Logic dictates that for this purpose, the Plaintiffs are only required to show how the Stacking Provision and the Three Rivers' Ban, if enforced, would negatively impact interstate commerce to a

21

greater degree than intrastate commerce. This they have done, and the Defendants have not created a genuine issue of material fact on the issue.

3.

According to the Plaintiffs, the Trucking Certification Provision and the Four or More Axle Provision, if enforced, would have a discriminatory impact upon MSW generated outside Virginia because virtually all MSW generated outside Virginia is delivered to landfills in vehicles with four or more axles, while the majority of MSW generated inside Virginia is delivered to landfills in vehicles with less than four axles. We have reviewed both the evidence offered by the Plaintiffs in support of this assertion and the evidence offered by the Defendants in contest in the light most favorable to the Defendants. It suffices to say that the record reflects a genuine issue of material fact regarding whether the Trucking Certification Provision and the Four or More Axle Provision, if enforced, would discriminate against MSW generated outside Virginia in practical effect.

C.

We now ask whether, viewing the evidence in the record in the light most favorable to the Defendants, and drawing all reasonable inferences in their favor, reasonable jurors could find that Virginia's General Assembly enacted the statutory provisions at issue without a discriminatory purpose.

> Several factors have been recognized as probative of whether a decisionmaking body was motivated by a discriminatory intent, including: (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by

22

> decisionmakers on the record or in minutes of their meet-
> ings.

Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810, 819 (4th Cir.
1995).

We conclude the record in this case establishes that no reasonable juror could find that in enacting the statutory provisions at issue Virginia's General Assembly acted without a discriminatory purpose. Furthermore, the record in this case establishes that no reasonable juror could find that in signing the statutory provisions at issue into law Governor Gilmore acted without a discriminatory purpose.

Our conclusions rest upon the historical background of and sequence of events leading up to the General Assembly's enactment of and Governor Gilmore's signing into law the statutory provisions at issue. In 1998, the General Assembly and Governor Gilmore learned that, as of 1997, Virginia had become the nation's second largest importer of MSW.[8] Next came the widely reported news that New York City was planning to close the Fresh Kills landfill and begin exporting more of its MSW. Then came reports that Waste Management was making a $20,000,000 investment in the James River facility. At this point, the wheels of a political movement to curb the flow of MSW generated outside Virginia from entering the borders of Virginia began to turn. The movement was co-spearheaded by Senator Bolling and Governor Gilmore.

On September 30, 1998, Senator Bolling issued a press release and formal statement pertaining to his intention to introduce "The Solid Waste Management Act of 1999" for consideration by Virginia's General Assembly during its 1999 legislative session. Senator Bolling's statement began by noting Virginia's then-current status as the second largest importer of MSW in the nation. He further noted that "[m]ost of the out of state waste currently coming to Virginia originates in New York, although significant amounts also come from the District of Columbia and the state of Maryland." (J.A. 601). Senator Bolling then listed a number of factors that he opined would increase

_____

**8** Both the Congressional Research Service and the DEQ issued reports in 1998 announcing Virginia's number two MSW-importer ranking.

23

pressure to import dramatically larger amounts of MSW generated outside Virginia. In this regard, Senator Bolling cited an announcement by Waste Management that it had entered into a new contract with New York City to import 2,400 tons of MSW a day into Virginia; New York's intent to export 14,000 tons of MSW a day upon the closing of the Fresh Kills landfill, the vast majority of which appeared to be heading to Virginia; and the plans of the then-nation's largest importer of MSW, Pennsylvania, to enact aggressive legislative measures to reduce the amount of MSW generated outside Pennsylvania from being imported into Pennsylvania.

Senator Bolling's statement then stated: "Some may ask why Virginians should be concerned about the large volume of out of state waste we are currently receiving? While there are a number of legitimate concerns, the following are some of the most important." (J.A. 601). Senator Bolling then proceeded to list the following four reasons: (1) continuing to allow Virginia's limited landfill space to be consumed by MSW generated outside Virginia may harm the ability of Virginia to properly dispose of its own waste in years to come; (2) because MSW generated outside Virginia is handled by a number of vendors before being transported to Virginia, Virginia's ability to have a satisfactory level of confidence about the nature of the waste it receives is limited; (3) the large amount of MSW generated outside Virginia that Virginia is currently receiving "has the potential of harming Virginia's legacy and image"; and (4) the potential for negative environmental impact on Virginia's land by the "massive landfill operations." (J.A. 602). Senator Bolling then stated that it was his belief that:

> . . . Virginia must act now to adopt a comprehensive solid waste management policy for the 21st century. Such a policy must assure that Virginia's solid waste disposal needs are addressed first, that the potential adverse environmental impacts associated with massive landfill operations are controlled, and that the important legacy of Virginia is preserved.

(J.A. 602). "Toward this end," Senator Bolling then stated, "I today announce my intention to introduce The Solid Waste Management Act of 1999 for consideration during the 1999 legislative session." Id.

24

In the press release accompanying his formal statement, Senator Bolling echoed the protectionist motivation behind his introduction of The Solid Waste Management Act of 1999:

> "There is tremendous excess capacity in Virginia's landfills today. If we don't act now to cap the total amount of waste that can be disposed of in Virginia's landfills, the amount of waste being brought to Virginia from other states will increase significantly in the next few years. <u>Such caps are the only effective way of limiting the amount of waste that is being imported to Virginia, and preserving our current landfill capacity for future generations of Virginians</u>."

(J.A. 607) (emphasis added).

Three months later, on January 15, 1999, Governor Gilmore issued a press release containing the text of a letter he sent to New York City Mayor Rudolph Giuliani the same day. The letter reads:

> Dear Mayor Giuliani:
>
> I am greatly concerned by your recent comments regarding the transport of New York City's municipal waste to Virginia and the policy you announced in December to increase exports of waste to neighboring states. Like millions of people living from Maine to Florida, I am offended by your suggestion that New York's substantial cultural achievements, such as they are, obligates Virginia and other states to accept your garbage. <u>Let me assure you that the home state of Washington, Jefferson, and Madison has no intention of becoming New York's dumping grounds.</u>
>
> Over the past two weeks, one company in Virginia has tripled its shipments of New York's municipal waste to Virginia landfills to approximately 3,000 tons a day. The company also reports that it expects shipments to increase to roughly 2.2 million tons per year by 2002. Already, Virginia ranks as the second largest importer of municipal solid waste, behind only Pennsylvania. This is highly unacceptable.

25

I understand the problem New York City faces. It is one that most cities in the nation share. As an urban area, you do not have landfill facilities within your locality. However, I cannot agree with your conclusion that the only solution is to send your waste to Virginia. The Northeast is large and has many rural areas. I would hope that you could find a solution to your problem within your region. Unlike most rivers, your garbage can flow north as well as south.

I agree with you that New York is a great city with some of the finest cultural amenities in the world. But Virginia is a great state, deep with history, culture and tradition. I have a duty to ensure the protection of the natural and historic resources of Virginia and a solution to this growing trash problem is essential to my fulfilling that duty.

Very truly yours,

James S. Gilmore, III
Governor of Virginia

(J.A. 633-34) (emphasis added).

Just a week after the Governor issued his press release, the Governor announced in another press release that he was proposing, and that Senator Bolling would be the chief patron of, legislation intended to prevent Virginia from becoming the nation's dumping ground. Specifically, the Governor stated:

The home state of Washington, Jefferson, and Madison has no intention of becoming the nation's dumping grounds. . . . That is <u>why</u> I've asked Senator Bolling to sponsor these bills that will increase state regulations on landfills, cap daily landfill deposits, and ban trash barges on Virginia's waterways.

(J.A. 635) (emphasis added).

On January 26, 1999, Senator Bolling promptly followed with a memorandum to the members of the Solid Waste Subcommittee of

26

the Senate Committee on Agriculture, Conservation and Natural Resources, stating:

> One of the most important issues that will be discussed during this year's session of the General Assembly is the debate surrounding Virginia's solid waste management practices. While many in the General Assembly have been concerned about this issue for some time, the issue has taken on "front page prominence" in the last few weeks, primarily due to the emphasis that has been placed on out of state waste imports. I am writing to provide you with some background information on this issue.

> Earlier this year, the Department of Environmental Quality published their first written report quantifying the amount of waste that was being placed in Virginia's landfills. Surprisingly, this report indicated that Virginia was receiving 3.2 million tons of garbage from other states, primarily New York. New York accounted for approximately 60% of our total waste imports, and imports accounted for approximately 30% of our total landfill deposits. Based on these findings, Virginia was identified as the second largest importer of waste in the nation.

> Unfortunately, the amount of garbage being imported to Virginia has grown dramatically in the past year. That is primarily due to the impending closure of the Fresh Kills landfill in New York City, and the fact that Waste Management, Inc., who owns most of the large regional landfills in Virginia, has received the contract to handle the relocation of the Fresh Kills waste stream.

> \* \* \*

> [T]hese large and increasing waste deposits are prematurely exhausting Virginia's limited landfill capacity. In fact, the Department of Environmental Quality has estimated that our current landfill capacity could be exhausted 20 years sooner than would otherwise be the case. This means that we may have to site an entire generation of new landfills in Virginia

27

> 20 years sooner than we would otherwise have to do so sim-
> ply because our current landfill space is being filled up by
> waste from other states.

* * *

> [T]hese waste deposits could create long term environmen-
> tal problems for Virginia. . . . While we have no choice but
> to assume this burden for our own waste, we should feel no
> obligation to assume that burden for the waste of other
> states.

> Finally, I would suggest that becoming the nation's "King
> of Trash" is not consistent with the image we have tried to
> promote for Virginia. . . . How can we possibly promote
> Virginia as the Silicon Dominion of the 21st century while
> we stand idly by and allow Virginia to become the largest
> importer of garbage in the nation.

(J.A. 637-38).

A few days after Senator Bolling issued the above quoted memo-
randum, in response to a request by another senator, he issued another
memorandum to the Senate's Solid Waste Subcommittee containing
additional information regarding the importation of MSW generated
outside Virginia into Virginia's regional landfills. In this memoran-
dum, Senator Bolling clearly outlined the potential for discriminatory
impact upon MSW generated outside Virginia: "The vast majority of
the municipal solid waste being received at the seven regional land-
fills in Virginia comes from other states. While the percentage of out
of state waste statewide is approximately 30%, the percentage of out
of state waste at the seven regional landfills is 71%." (J.A. 667). On
the same day, Senator Bolling personally addressed the Solid Waste
Subcommittee and verbally reassured committee members that most
local landfills in Virginia accept less than one hundred tons of MSW
a day, and thus would not be affected by a 2,000 ton per day cap. The
record also contains transcripts of speeches on the floor of the Gen-
eral Assembly by two delegates to the General Assembly and the gen-
eral reaction of fellow delegates. The transcripts establish the General
Assembly's general antipathy toward MSW generated outside Vir-

28

ginia. First, one delegate to the General Assembly queried: "`Do we want to be known as the capital of garbage?'" (J.A. 1007). His query was met with a chorus of nos. He then queried: "`Maybe we need a new bumper sticker--instead of Virginia is for lovers, what about Virginia is for garbage? Or how about a special license plate with a dumpster on it.'" Id. Again, the record shows a chorus of nos. Finally, Delegate Williams lamented before the General Assembly: "`What a message we are sending, buy a home, live in the great Common-wealth, the number one importer of garbage.'" Id. Another delegate to the General Assembly explained:

> "This [cap provision] is the second bill in the Governor's package that deals with the waste problem that we are hav-ing and I consider it the most important bill in the gover-nor's package . . . . [T]his bill is the one that really gets at the doubling of waste the last two or three years at our land-fills and the potential to double that waste again in the next two or three years."

Id. (alteration in original).

The evidence just outlined shows unmistakably the legislative and gubanatorial opposition to further increases in the volume of MSW generated outside Virginia crossing the borders of Virginia for ulti-mate placement in Virginia's seven regional landfills.**9** No reasonable

_____

**9** Although the Defendants do not directly dispute the accuracy or authenticity of the press releases and transcripts just discussed and in some cases quoted, the Defendants argue the quotation's from the press releases and the debate transcripts are inadmissible because they "were not authenticated and were replete with double-hearsay." (the Defen-dants' Br. at 44). Because the Defendants failed to make these objections below, and a gross miscarriage of justice has not resulted from the dis-trict court's consideration of the challenged evidence in support of the Plaintiffs' motion for summary judgment, the Defendants waived their right on appeal to challenge the admissibility of this evidence. See Jones v. Owens-Corning Fiberglass Corp., 69 F.3d 712, 718 (4th Cir. 1995); Liberles v. Cook County, 709 F.2d 1122, 1126 (7th Cir. 1983); Auto Drive-Away Co. of Hialeah, Inc. v. Interstate Commerce Commission, 360 F.2d 446, 448-49 (5th Cir. 1966); 10A A. Charles Alan Wright et al., Federal Practice & Procedure § 2716, 282-286 (3d ed. 1998). Accord-ingly, the Defendants on appeal cannot rely on these arguments of inad-missibility as a basis for reversal of the district court's grant of summary judgment in favor of the Plaintiffs.

29

juror could find the statutory provisions at issue had a purpose other than to reduce the flow of MSW generated outside Virginia into Virginia for disposal. Indeed, the very purpose the Defendants proffer in this litigation for the enactment of the statutory provisions at issue-- to alleviate or at least reduce health and safety threats to Virginia's citizens and environment created by the importation of MSW from states with less strict limitations upon the content of MSW than Virginia--fully supports our conclusion. This is because an inherent component of the Defendants' proffered purpose of Virginia's enactment of the statutory provisions at issue is discrimination against MSW generated outside Virginia. Whether Virginia has a constitutionally valid reason for engaging in such discrimination is the focus of the strict scrutiny inquiry.

The Defendants contend the record shows that a genuine issue of material fact exists with respect to whether the statutes at issue were enacted with discriminatory intent or for neutral reasons. In support, the Defendants direct our attention to a post-enactment statement in a sworn declaration by Senator Bolling to the effect that he sponsored the statutory provisions at issue because of his concern over the rapid growth in the volume of MSW being deposited in Virginia landfills "regardless of the source" of that MSW. (J.A. 1228).

This statement is not sufficient to create a genuine issue of material fact on the issue of intent, because other statements by Senator Bolling in the same sworn declaration flatly contradict his "regardless of the source" phrase. Specifically, Senator Bolling admitted that MSW generated outside Virginia presented "increased concerns" on account of "the rapidly increasing volume and our perception that we in the Commonwealth have less control over the content of that waste and our ability to enforce Virginia regulations as to that waste stream." (J.A. 1229). In enacting the statutory provisions at issue, Senator Bolling further explained: "We were aware that the solid waste regulations of other states were not as stringent as those of the Commonwealth." Id. These latter quoted statements of Senator Bolling unequivocally show that the volume of MSW generated outside Virginia flowing into Virginia triggered more concern on the part of Virginia's General Assembly than the volume of MSW generated in Virginia being deposited in landfills located in Virginia. It is true that other portions of Senator Bolling's sworn declaration stress that Vir-

30

ginia intended the challenged statutes to regulate evenhandedly without regard to the source of the waste; however, the Defendants cannot create a genuine issue of material fact by presenting conflicting sworn statements as they have done with respect to the issue of discriminatory intent. Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

D.

We must next consider whether, viewing the evidence in the light most favorable to the Defendants, the Defendants have proffered sufficient evidence for reasonable jurors to find, with respect to each statutory provision at issue, that the provision is demonstrably justified by a valid factor unrelated to economic protectionism, and that no nondiscriminatory alternatives exist that are adequate to preserve the local interests at stake. Environmental Technology Council, 98 F.3d at 785.

1.

The Defendants argue that all of the statutory provisions at issue are demonstrably justified because "solid waste streams generated in trash exporting states raise health and safety concerns not presented by Virginia waste." (the Defendants' Br. at 56). In this regard, the Defendants stress that the problem is particularly acute with respect to exporting states that do not have laws as strict as Virginia's laws governing regulated medical waste and certain types of hazardous waste. By analogy, the Defendants rely upon Maine v. Taylor, 477 U.S. 131 (1986). In that case, Maine demonstrated that all out-of-state baitfish were subject to parasites foreign to in-state baitfish. This difference posed a threat to Maine's natural resources, and absent a less discriminatory means of protecting the environment--and none was available--the importation of baitfish from any state could properly be banned. Id. at 140.

The Plaintiffs do not quarrel with the Defendants' position that the health and safety of Virginia citizens is a legitimate local interest. Neither do we. Nevertheless, in order to survive the Plaintiffs' motion

31

for summary judgment with respect to the first prong of strict scrutiny analysis, the Defendants must carry their burden of showing that MSW generated outside Virginia is more dangerous than MSW generated in Virginia. Chemical Waste Management, Inc. v. Hunt, 504 U.S. 334, 343-44 (1992) (recognizing that while the health and safety of the citizens of Alabama may be a legitimate local interest, Alabama offered no evidence that hazardous waste generated outside Alabama is more dangerous than hazardous waste generated in Alabama; therefore, Alabama failed to carry its burden of showing that the Alabama statute imposing an additional fee on all hazardous waste generated outside Alabama and disposed of at Alabama facilities was demonstrably justified by a valid factor unrelated to economic protectionism).

In this regard, the Defendants have offered evidence demonstrating, when viewed in the light most favorable to them: (1) that certain materials in MSW can be hazardous to human health; (2) that each state has its own definition of MSW; (3) that "[w]hile one state may find it appropriate to regulate strictly a certain type of solid waste, another state may not be as aware of or concerned about the risks posed by that type of item into the MSW stream," (J.A. 356); (4) that Virginia law completely prohibits potentially infectious items such as blood and urine from being disposed of as MSW, while Maryland and North Carolina allow disposal of blood and urine as MSW under limited circumstances; (5) that Virginia law prohibits urine from being disposed of as MSW while New York allows its disposal as MSW without limitation; (6) that Maryland and New York allow hazardous waste generated at less than 100 kilograms per month to be disposed of as MSW while Virginia does not; and (7) that unlike Virginia, Maryland and New York do not impose manifesting or tracking requirements on hazardous waste from small quantity generators.

From this evidence, a reasonable juror could infer that, as a whole, MSW generated outside Virginia poses health and safety risks not posed by MSW generated inside Virginia. Such a finding would satisfy the Defendants' burden of establishing that the statutory provisions at issue are justified by a reason other than economic protectionism.

32

2.

With respect to the second prong of the strict scrutiny test, the Defendants must prove that the statutory provisions at issue are the least discriminatory means of addressing Virginia's concern that MSW generated outside Virginia poses health and safety risks not posed by MSW generated inside Virginia.

a.

The Defendants assert that any plan for improving state police powers over MSW must begin with and be linked to limiting the volume of MSW to a level where waste can be screened adequately. In support of this assertion, the Defendants rely on the following sworn statements by Virginia's Director of Program Coordination for DEQ:

> The cap statute is a necessary and appropriate response to the MSW volume crisis faced by the Commonwealth. The problem is particularly acute with regard to out-of-state MSW. While out-of-state MSW poses more of a threat than Virginia MSW, the Commonwealth has less ability to police the out-of-state loads. Any plan for improving state police powers over MSW must begin with and be linked to controlling the volume to a level where waste can be adequately screened.

> The disposal cap statute allows the Commonwealth to better protect health and safety within the Commonwealth by controlling daily levels of MSW to a volume that reasonably can be managed and policed.

\* \* \*

> Increased DEQ inspections are a valuable mechanism for increasing adherence to regulations. However, the volume problem cannot be controlled simply by stepping up the inspection rate at landfills. The number of inspectors is simply one component of an effective waste-screening program by the Commonwealth. Matching the number of inspectors

33

to the increasing volumes becomes counterproductive at a point where the traffic of large container trucks arriving at the landfill face, depositing their loads, and departing renders the landfill face unsafe for foot traffic. Without a doubt, high volumes of waste make inspecting waste even more difficult and exacerbate an ongoing problem.

The time required for the DEQ inspectors to adequately screen the waste will limit the volume of waste that can be processed at a landfill on a daily basis. An effective screening program by the Commonwealth would require the unloading of vehicles on an impermeable pad or other area dedicated to waste screening. The waste would then have to be spread to a sufficient shallow depth on the pad to identify individual components, including the breaking apart of waste received in a baled, compacted, or frozen state. Intense visual screening would then be conducted by the inspector. Besides visual screening, chemical analysis through hazardous waste screening devices would have to be undertaken in order to detect hazardous waste which cannot be detected visually. Further, the testing protocol for certain waste may involve laboratory analysis that cannot be completed in short duration. If unauthorized waste is discovered, processes must be in place for the removal and proper disposition of waste at an appropriate waste facility. The Commonwealth will have to develop a specific program depending on the needs and character of each different facility. Once a program is developed, it will have to be refined until it is proven effective. This process would slow operations down to a halt and have the practical effect of lowering daily intake to far lower than 2,000 tons a day.

A properly designed certification requirement would not be as effective as the disposal cap statute because, without volume control, DEQ cannot adequately police MSW loads.

(J.A. 1159-61).

In response, the Plaintiffs primarily argue that the Defendants have failed to meet the second prong because the Cap Provision does not

34

use the least discriminatory means of addressing the alleged health and safety concern about the composition of MSW generated outside Virginia. The Plaintiffs point out that the Cap Provision makes no effort to distinguish between the MSW of states according to an individual state's level of MSW regulation. According to the Plaintiffs, interstate commerce would be burdened less if Virginia only capped the amount of waste that can be imported from states with MSW regulatory schemes less restrictive than Virginia. Additionally, the more closely a state's MSW regulatory scheme tracks that of Virginia, the higher the cap should be.

At first blush, the Plaintiffs' argument seems more discriminatory against MSW generated outside Virginia than the across the board cap in the Cap Provision. However, when one carefully considers the Plaintiffs' argument, its logic is clear. If a state enacts a statute that purposely discriminates against interstate commerce in an effort to address a concern other than economic or resource protectionism, the second prong of the strict scrutiny test requires that the statute impose the least burden possible on interstate commerce. In other words, rather than discriminating against MSW from every state other than Virginia, Virginia's cap should only target the MSW from states that have lesser health and safety standards regarding MSW than Virginia. Because the Defendants have presented no evidence as to why a narrower capping statute would not adequately address the identified health and safety concerns for Virginia citizens, the Defendants fail to survive the Plaintiffs' motion for summary judgment with respect to the second prong of the strict scrutiny test as it pertains to the Cap Provision.[10]

_____

[10] The situation at issue here is materially distinguishable from the situation in Maine v. Taylor, 477 U.S. 131 (1986), legal authority heavily relied upon by the Defendants. In Taylor, sampling and inspection procedures did not already exist for testing whether baitfish imported from outside Maine contained parasites harmful to native fisheries. Here, sampling and inspection procedures already exist for testing whether MSW generated outside Virginia contains materials harmful to the health and safety of Virginia citizens. The Defendants' proffered nondiscriminatory reason for the Cap Provision is that some states have less strict regulations regarding the content of MSW than Virginia. The Defendants have offered evidence that the inspection procedures regarding MSW are inad-

35

b.

The Defendants argue that they have submitted sufficient evidence to create a genuine issue of material fact regarding whether the Stacking Provision and the Three Rivers' Ban are the least discriminatory alternatives available for protecting the health and safety of Virginia citizens against the toxic contamination of its rivers from unintended spills. We agree. Notwithstanding the Plaintiffs' protestations to the contrary, the Defendants have submitted sufficient evidence in this regard to create genuine issues of material fact that need to be resolved by the trier of fact. For example, the Defendants have submitted the sworn statement of DEQ Director Dennis Treacy that based upon his knowledge and experience, the Stacking Provision and Three Rivers' Ban are necessary to protect the health and safety of Virginia citizens. Treacy outlines in a sworn declaration why and how barge transport of MSW presents serious and unique health and safety threats to Virginia's citizens that cannot be alleviated absent enforcement of the Stacking Provision and the Three Rivers' Ban. Furthermore, the record contains Hale's answers to interrogatories in which Hale admits: (1) in 1993, it lost thirty-three containers containing general merchandise overboard on a barge it owned due to improper lashing; and (2) in 1994, a fire resulted in the partial destruction of cargo on board a barge it owned. These incidents certainly suggest the potential for a health and environmental disaster on a Virginia waterway presented by the barge transport of MSW.

c.

As for the Trucking Certification Provision and the Four or More Axle Provision, the Defendants fail to offer any affirmative evidence of the non-existence of less burdensome alternatives on interstate commerce. Instead, the Defendants rely on the deference that is tradi-

_____

equate to protect the health and safety of Virginia citizens with respect to MSW generated from states outside Virginia with MSW regulatory schemes less strict than Virginia. However, the Defendants have offered no evidence as to why the MSW generated from states with MSW regulatory schemes that are equally or more strict than Virginia should be capped.

36

tionally given state legislation in the area of highway safety. The traditional deference that is due state legislation in the area of highway safety

> derives in part from the assumption that where such regulations do not discriminate on their face against interstate commerce, their burden usually falls on local economic interests as well as other States' economic interest, thus insuring that a State's own political processes will serve as a check against unduly burdensome regulations. Less deference to the legislative judgment is due . . . where the local regulation bears disproportionately on out-of-state residents and businesses.

Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 675-76 (1981) (internal quotation marks omitted).

While all the parties agree that the Trucking Certification Provision and the Four or More Axle Provision are not facially discriminatory against MSW generated outside Virginia, and we have already determined that a genuine issue of material fact exists regarding whether these statutory provisions discriminate in their practical effect against MSW generated outside Virginia, the Defendants' argument that we are required to give deference to the legislative judgment of the General Assembly in applying the second prong of the strict scrutiny analysis (to the Trucking Certification Provision and the Four or More Axle Provision) is without merit. This is because we have also determined that no reasonable juror could find that in enacting these two statutory provisions Virginia's General Assembly acted without a discriminatory purpose. Such a discriminatory purpose wholly undercuts the notion that Virginia's political process served as a check against unduly burdensome regulations. Without such a check, the rationale for owing deference to the legislative judgment of Virginia's General Assembly in the area of highway safety is completely lacking.

With no deference owed to the legislative judgment of Virginia's General Assembly in enacting the Trucking Certification Provision and the Four or More Axle Provision, and with absolutely no evidence showing that less burdensome alternatives do not exist on interstate commerce, these two statutory provisions do not survive the

37

second prong of the strict scrutiny test. Accordingly, we affirm the district court's grant of summary judgment in favor of the Plaintiffs with respect to their dormant Commerce Clause challenge in regard to the Trucking Certification Provision and the Four or More Axle Provision.

E.

The Defendants next seek to avoid confrontation with the strictures of the dormant Commerce Clause altogether by asserting application of the market participant doctrine. Under the market participant doctrine, "a state acting in its proprietary capacity as a purchaser or seller may favor its own citizens over others." Cammps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 592-93 (1997) (internal quotation marks omitted). If there is no "direct state involvement in the market," however, the strictures of the dormant Commerce Clause apply with full force. Id. at 593.

The record in this case, when viewed in the light most favorable to the Defendants, leaves no doubt, as the district court astutely observed, that in enacting the statutory provisions at issue, Virginia was not acting as a private participant in the waste disposal market, but as regulator of "the conduct of others in that market as only a state can do." Waste Management II, 64 F. Supp.2d at 544. Accordingly, the market participant doctrine is inapplicable.

F.

The Defendants next argue that in enacting Subchapter IV of the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. §§ 6941-6949a, Congress intended to authorize a state to discriminate against MSW generated outside that state, thus overriding the dormant Commerce Clause. We disagree.

The dormant Commerce Clause prohibits states from unjustifiably discriminating against the free flow of interstate commerce. Environmental Tech. Council, 98 F.3d at 782.

> Where Congress has acted in an area specifically authorizing state or local government action, the dormant Com-

38

merce Clause is, however, inapplicable, even if the state action interferes with interstate commerce. . . .

In order for a state law to be removed from the reach of the dormant Commerce Clause, however, congressional intent to authorize the discriminating law must be either unmistakably clear or expressly stated. Congress need not state that it intends to override the dormant Commerce Clause, but it must affirmatively have contemplated the otherwise invalid state legislation.

Id. (internal quotation marks omitted). Here, the Defendants bear the burden of establishing congressional intent to authorize a state to discriminate against MSW generated outside that state. Wyoming v. Oklahoma, 502 U.S. 437, 458 (1992).

Subchapter IV of RCRA governs "State or Regional Solid Waste Plans." Its objectives "are to assist in developing and encouraging methods for the disposal of solid waste which are environmentally sound and which maximize the utilization of valuable resources including energy and materials which are recoverable from solid waste and to encourage resource conservation." 42 U.S.C. § 6941. These objectives are to be accomplished by federal "assistance to States or regional authorities for comprehensive planning pursuant to Federal guidelines . . . ." Id.

In support of their congressional override argument, the Defendants point to a provision of Subchapter IV in which Congress directed that states be encouraged to consider numerous local conditions in addressing their solid waste disposal problems, including: "population density, distribution, and projected growth"; local "geographic, geologic, climatic, and hydrologic characteristics"; and "political, economic, organizational, financial, and management problems affecting comprehensive solid waste management." 42 U.S.C. § 6942(c). According to the Defendants, by encouraging states to account for these factors in creating MSW plans, Congress "explicitly gave states the authority to protect local interests when it comes to MSW management, including the authority to limit or exclude MSW from other states." (the Defendants' Br. at 37).

39

The Defendants also contend that the legislative history of RCRA makes unmistakably clear that Congress intended to override the dormant Commerce Clause so as to constitutionally permit a state to refuse disposal of MSW generated outside that state. The snippets of legislative history upon which the Defendants rely in making this argument are as follows: (1) "[i]n formulating a state plan it is the Committee's intention to permit wide flexibility on the part of the state developing such plan so that each state can plan for its particular problems," H.R. Rep. No. 94-1491, pt. 1 at 35 (1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6273; (2) Subchapter IV does not "prevent or effect [sic] any activities that [were] presently being carried out" by states at the time Subchapter IV was enacted,[11] id. at 64, 6302; and (3) a statement that "[i]t is the purpose of this legislation to assist the cities, counties and states in the solution of the discarded materials problem," id. at 11, 6249.

Below, the district court concluded that these isolated bits of legislative history and the broadly worded statutory language upon which they rely "do not come close to expressing an `unmistakably clear' intent on the part of Congress to exempt state laws relating to solid waste from the limitations of the dormant Commerce Clause." (J.A. 10). We fully agree with this conclusion. The fragments of statutory language and legislative history cited by the Defendants fall far short of the demanding standard that congressional intent be unmistakably clear. See In re: Southeast Arkansas Landfill, Inc., 981 F.2d 372, 377 (8th Cir. 1992) (holding that "[n]othing in RCRA or any other federal statute comes close to authorizing different treatment of out-of-state waste").

G.

The Defendants' next to last attempt at avoiding the strictures of

_____

11 The Defendants claim this second snippet of legislative history is relevant because at the time Congress enacted Subchapter IV it acknowledged that "[s]ome states have moved to ban the importation of waste as have their political subdivisions. These actions have raised serious questions relative to restraint of trade and interference with interstate commerce." H.R. Rep. No. 94-1491, pt. 1 at 3 (1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6240.

the dormant Commerce Clause altogether is their assertion of a purported affirmative defense. In this regard, the Defendants challenge the district court's grant of the Plaintiffs' motion to strike their affirmative defense.

Federal Rule of Civil Procedure 12(f) permits a district court, on motion of a party, to "order stricken from any pleading any insufficient defense." Rule 12(f) motions are generally viewed with disfavor "because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." 5A A. Charles Alan Wright et al., Federal Practice & Procedure § 1380, 647 (2d ed. 1990). Nevertheless, "a defense that might confuse the issues in the case and would not, under the facts alleged, constitute a valid defense to the action can and should be deleted." Id. § 1381 at 665.

The Defendants' purported affirmative defense is based upon their assertion that New York City interfered with the free flow of commerce, and by extension the Commerce Clause, by taking affirmative steps to discourage the disposal of MSW within the borders of the State of New York. Having so interfered, the Defendants contend the Plaintiffs are prohibited from challenging the statutory provisions at issue under the dormant Commerce Clause. Not surprisingly, the Defendants cite no case law in support of their position.

We hold the district court did not err in striking the Defendants' purported affirmative defense. Even assuming arguendo that New York's alleged conduct should legally prevent it from bringing a constitutional challenge under the dormant Commerce Clause to the statutory provisions at issue, at the risk of stating the obvious, neither the State of New York nor New York City is a plaintiff in this litigation. Furthermore, we see no basis for somehow holding any of the Plaintiffs vicariously liable for the conduct of the State of New York and/or New York City.

VI.

Lastly, the Defendants challenge the district court's holding that the Three Rivers' Ban and the Stacking Provision violate the Supremacy Clause. The Supremacy Clause provides that the "Constitution,

41

and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl.2.

> Thus, federal legislation, if enacted pursuant to Congress' constitutionally delegated authority, can nullify conflicting state or local actions. Consideration of issues arising under the Supremacy Clause start[s] with the assumption that the historic police powers of the States [are] not to be super-seded by . . . Federal Act unless that [is] the clear and mani-fest purpose of Congress. The ultimate touchstone of preemption analysis is the intent of Congress. Even when Congress' intent is unclear, state law must nevertheless yield when it conflicts with federal law. In making the deter-mination of whether state law conflicts with federal law, the test to apply is whether it is impossible to comply with both state and federal law or whether the state law stands as an obstacle to the accomplishment of the full purposes and objectives of the relevant federal law.

National Home Equity Mortg. Assoc. v. Face, 2001 WL 101454 at *2 (4th Cir. February 7, 2001) (internal quotation marks and citations omitted) (alteration in original).

The Supremacy Clause claim at issue in this appeal principally relies on the federal documentation provisions governing the use of vessels in the coastwise trade. See 46 U.S.C. § 12103 (describing pre-requisites for issuance of a "certificate of documentation") and § 12106 (describing criteria for endorsing a certificate of documenta-tion with a "coastwise endorsement"). According to the record, each barge that Hale plans to supply Waste Management for the transporta-tion of MSW has a valid federal Certificate of Documentation autho-rizing it to engage in "coastwise trade" and a valid Coast Guard Certificate of Inspection.

The Supreme Court has held that a federal license confers upon the licensee a right to operate freely in each state's waters, subject only to legitimate exercises of the state's police power. Douglas v. Sea-

42

coast Prods., Inc., 431 U.S. 265, 281 (1977). Thus, "[s]tates may impose upon federal licensees reasonable, nondiscriminatory conservation and environmental protection measures otherwise within their police power." Id. at 277. Precedent is clear, however, that a state statute that completely excludes federally licensed commerce upon such state's waterways is unconstitutional. Id. 283.

Here, the Three Rivers' Ban completely excludes federally licensed barges from transporting any type or amount of MSW on the Rappahanock, James and York Rivers in Virginia. The reasonableness of such a complete ban is simply not supported by the evidence in the record, even when viewed in the light most favorable to the Defendants. The issue of whether federal preemption of the Stacking Provision exists is far less clear. Indeed, genuine issues of material fact exist regarding the health and environmental risks associated with stacking sealed shipping containers containing MSW more than two high on barges. Accordingly, the district court erred in concluding as a matter of law that the Stacking Provision violates the Supremacy Clause.**12**

_____

**12** The Defendants contend that the "savings" language contained in the Three Rivers' Ban and the Stacking Provision save those statutes from a Supremacy Clause challenge. We reject this argument on the basis that the restrictions at issue are straightforward and their accompanying savings language is repugnant to those restrictions. See Looney, 133 S.E. at 755.

We also reject the Defendants' argument that 42 U.S.C. § 1983 does not provide Hale a remedy with respect to its Supremacy Clause claim. By its terms, Title 42 U.S.C. § 1983 only provides a remedy for the violation of rights that are defined in the Constitution or in a federal statute. Thus, the § 1983 remedy will be available for a violation of a federal statute only if the statute itself "gives rise to a federal right." Blessing v. Freestone, 520 U.S. 329 (1997).

While "the Supremacy Clause, of its own force, does not create any rights enforceable under § 1983," Golden State Transit v. Los Angeles, 493 U.S. 103, 107 (1989), the federal documentation provisions governing the use of vessels in the coastwise trade, see 46 U.S.C. §§ 12103, 12106, confer a right in the form of a license to operate freely in each state's waters subject only to the legitimate exercise of a state's police powers. Douglas, 431 U.S. at 281. As the holder of such licenses, Hale has standing to assert its Supremacy Clause claim under § 1983.

43

VII.

In conclusion, we affirm the district court's grant of summary judgment in favor of the Plaintiffs with respect to their dormant Commerce Clause challenges to the Cap Provision, the Trucking Certification Provision, and the Four or More Axle Provision. We also affirm the district court's grant of summary judgment in favor of the Plaintiffs with respect to Hale's Supremacy Clause challenge to the Three Rivers' Ban. However, we vacate the district court's grant of summary judgment in favor of the Plaintiffs with respect to their dormant Commerce Clause challenge to the Three Rivers' Ban and the Stacking Provision and remand for further proceedings consistent with this opinion. We also vacate the district court's grant of summary judgment in favor of Hale with respect to Hale's claim that the Stacking Provision violates the Supremacy Clause and remand for further proceedings consistent with this opinion. Finally, we vacate the district court's entry of judgment against Governor Gilmore and remand with instructions that the district court dismiss him as a party in this action.

<u>AFFIRMED IN PART, VACATED IN PART,</u>
<u>AND REMANDED</u>

WIDENER, Circuit Judge, concurring:

I concur in all of the opinion of the court except Part IV.A, and I concur in the result that Part IV.A obtains.

I.

The pertinent part of the Code section involved is not complicated:

> Any locality is authorized to contract with any person, whether profit or non-profit, for garbage and refuse pickup and disposal services in its locality and to enter into contracts relating to waste disposal facilities which recover energy or materials from garbage, trash and refuse.

Virginia Code § 15.2-932 (Michie 1997).

44

As to Part IV.A and the statute involved here, it is obvious to me that a more reasonable reading of the plain language of the statute would confine the contracting authority to "its locality" in accord with the position taken by the defendants under the Dillon's rule construction required in Virginia when construing statutes conferring power upon political sub-divisions. That rule, as construed, is that "[a]ny fair, reasonable doubt concerning the existence of the power is resolved by the courts against the corporation and the power is denied," as noted in the majority opinion, slip 16. Richmond v. Bd. of Sup'rs of Henrico County, 101 S.E.2d 641, 645 (Va. 1958). But this Code section has been construed by the Virginia Supreme Court in Concerned Residents v. Bd. of Sup'rs of Gloucester County, 449 S.E.2d 787 (Va. 1994) in the context of trash collection, as here: "action taken by the county in response thereto is a legislative act in the furtherance of the county's police powers." 449 S.E.2d at 790. "When a legislative body [so] exercises its police powers every possible presumption shall be indulged in favor of the validity of its legislative act." 449 S.E.2d at 790.

In the case at hand there is no doubt that the trash facility involved here undertook, with the agreement and consent of the county, the reception of trash from outside Virginia. This undertaking was just such an exercise of police power as the Virginia Court referred to in Concerned Residents. When that is taken into account, in my opinion, taking the out-of-state trash into the Virginia trash dump was not ultra vires under the Dillon rule. In this construction of the statute, I am supported by Virginia Code § 15.2-937(B), a part of the same statutory scheme as § 15.2-932, which refers to "solid waste transported from any jurisdiction," an obvious inference that the importation of foreign trash is contemplated by the statute.

The powers of political sub-divisions in Virginia are quite limited under Dillon's rule, as noted by the majority. In addition to powers granted in express words, or incident to and necessary, or fairly implied, by such words, they are limited to "those essential to the accomplishment of the declared objects and purposes of the corporation - not simply convenient but indispensable." Board of Supervisors of Henrico Co., 101 S.E.2d at 645; Cline v. Robb, 548 F. Supp. 128, 131 n.7 (E.D. Va. 1982) (three-judge court). The Commonwealth can thus limit the power of political sub-divisions to contract with waste

45

disposal facilities of any kind, but the Commonwealth may not authorize a political sub-division to contract with such waste disposal facilities in violation of the Constitution, as here.

There is no reason apparent why Virginia may not permit her political sub-divisions to operate waste disposal facilities for their own benefit, either performing the operation itself or by contract. Or Virginia may do the same. In that event, the Commonwealth or the political sub-division disposing of local waste would act under the market participant exception to the Dormant Commerce Clause. See <u>Reeves, Inc. v. Stake</u>, 447 U.S. 429 (1980) (holding that a state-owned concrete plant could choose to sell only to state residents); <u>Nat'l Solid Waste Mgmt. Assn. v. Williams</u>, 146 F.3d 595 (8th Cir. 1998); cf. <u>Med. Waste Mgmt. Assoc. v. Mayor and City Council of Baltimore</u>, 966 F.2d 148 (4th Cir. 1992). But if the Commonwealth chooses to permit the political sub-divisions to use waste disposal as a revenue source by the importation of foreign waste, it must be done within the confines of the Constitution. Language authorizing political sub-divisions to act as market participants might be easily drafted, but such has not been accomplished here.

II.

I do not rely on the rather flamboyant statements of the political authorities in arriving at my concurrence.

KING, Circuit Judge, concurring in part and dissenting in part:

I am pleased to concur in nearly all of the fine opinion authored by my friend Judge Hamilton. I part company with him solely on the issue concerning the propriety of this suit being maintained against Governor Gilmore, and I respectfully dissent on that point. In determining that the Governor is not a proper party to this action, the majority, in my view, erroneously concludes that "[t]he fact that he has publicly endorsed and defended the challenged statutes does not alter our analysis." <u>Ante</u>, at 15. The majority instead posits that our resolution of this question rests on whether his general duty to "take care that the laws be faithfully executed," Va. Const. art. V, § 7, makes him a proper defendant in this case under the exception to Eleventh Amendment immunity found in <u>Ex parte Young</u>, 209 U.S.

123 (1908). Because Governor Gilmore's connection to the statutes at issue is far more specific than his general duty to uphold the law, I would not dismiss him as a party.[1]

The majority's own account of the facts in this case confirms to me that Governor Gilmore is not just a superfluous target of the Plaintiffs. Upon learning of New York City's imminent exportation of municipal solid waste ("MSW"), the Governor announced plans to "dispatch[] his top environmental officials to meet with their counterparts from other states `to ensure that Virginia does not drown in a regional sea of garbage.'" Ante, at 9 (quoting J.A. 597). He also imposed a moratorium on new landfill development, and he instructed his Secretary of Natural Resources to recommend legislation to deal with the MSW problem. See id. at 9. The Governor himself proposed such legislation in his 1999 State of the Commonwealth address to the General Assembly of Virginia, referring specifically to Waste Management's plans "`to import four thousand more tons of New York City trash into Virginia per day.'" Id. (quoting J.A. 630). Moreover, "when New York City Mayor Giuliani suggested that Virginia might have an obligation to accept New York City's MSW, Governor Gilmore responded that `the home state of Washington, Jefferson, and Madison has no intention o[f] becoming New York's dumping grounds.'" Id. (quoting J.A. 635) (alteration in original). In fact, in early 1999, the General Assembly approved and the Governor signed into law the five statutory provisions at issue in this case. See id. at 10.

Furthermore, Governor Gilmore's co-defendants -- the Commonwealth's Secretary of Natural Resources and the Director of the Virginia Department of Environmental Quality -- possess unquestioned authority to enforce these statutes. Significantly, though not explicitly discussed in the course of the district court proceedings, they serve

_____

[1] Likewise, the district court, in retaining Governor Gilmore as a party, recognized that his connection to the disputed statutes extends beyond his general duty to uphold the law. The court noted that "many courts have held that a generalized duty to enforce state law is insufficient. Governor Gilmore, however, has actively and publicly defended the legislation at issue. He is therefore a proper defendant." Waste Mgmt. Holdings, Inc. v. Gilmore, 64 F. Supp. 2d 537, 543 n.6 (E.D. Va. 1999) (citations omitted).

47

under the direction and control of the Governor. <u>See</u> Va. Code Ann. § 2.1-51.7 (1995) ("The Secretary [of Natural Resources] shall hold office at the pleasure of the Governor . . . ."); <u>id.</u> § 2.1-51.8:1 ("The Secretary of Natural Resources shall be subject to direction and supervision by the Governor."); Va. Code Ann. § 10.1-1185 (1998) ("The Department [of Environmental Quality] shall be headed by a Director appointed by the Governor to serve at his pleasure for a term coincident with his own. The Director . . . shall, under the direction and control of the Governor, exercise such power and perform such duties as are conferred or imposed upon him by law and shall perform such other duties as may be required of him by the Governor . . . .").

In sum, not only did Governor Gilmore conceive and engineer passage of the statutes, he has championed those statutory provisions and, as is reflected in the Virginia Code, he possesses the direct authority over his co-defendants to effect his clear aim of enforcement.[2] In my view, the Governor's connection to the disputed statutory provisions amply supports retaining him as a defendant in this case, even under a stringent test for applying the <u>Ex parte Young</u> exception such as that recently articulated by the Fifth Circuit. <u>See Okpalobi v. Foster</u>, No. 98-30228, 2001 WL 242485, at *8 (5th Cir. Mar. 12, 2001) (en banc) (plurality opinion) ("[A]ny probe into the existence of a <u>Young</u> exception should gauge (1) the ability of the official to enforce the statute at issue under his statutory or constitutional powers, and (2) the demonstrated willingness of the official to enforce the statute.").[3]

I respectfully dissent from the majority opinion on this point only.
_____

[2] Because this case does not squarely present the issue, I need not take a position here on whether a governor's general duty to uphold the law, without more, can be sufficient to invoke the exception to Eleventh Amendment immunity found in <u>Ex parte Young</u>.

[3] At the very least, I would, rather than rule in favor of the Governor at this stage, remand this issue to the district court for a more extensive examination of the Governor's relevant statutory and constitutional powers in relation to the factual underpinnings of this case. <u>Cf. Lytle v. Griffith</u>, 240 F.3d 404, 410 (4th Cir. 2001) (where Eleventh Amendment immunity raised for first time on appeal, exercising discretion to remand the issue to the district court "to address in the first instance the relevant questions of fact and state law").

48